OPINION
{¶ 1} Ms. Lori Pearlstein and Dr. Richard Pearlstein both appeal from the trial court's divorce decree that dissolved their ten-year marriage.
 {¶ 2} Ms. Pearlstein contends that she is entitled to an upward deviation of her child support for their two children based on the parties' previous standard of living. She also asserts that the order compelling Dr. Pearlstein to pay their younger son's tuition in the future, if he should choose to attend private school, is speculative in nature *Page 2 
and thus should not have been considered for purposes of calculating current child support.[1]
 {¶ 3} On cross-appeal, Dr. Pearlstein raises numerous issues, some of which are not properly before this court as they were not raised in any of the proceedings below, or they relate to facts the parties stipulated to both during trial and in a post-trial submission in regard to the division of certain martial assets and debts. Thus, he raises twelve assignments of error relating to the de facto termination date of the marriage; the magistrate's finding that the valuation made by Ms. Pearlstein's expert of Dr. Pearlstein's medical practice was more credible; the valuation of Ms. Pearlstein's interior design business at zero; the allocation of marital debt; a separate interest in the doctor's inheritance; the management of the children's investment account; the tax consequences of the property division; the court's failure to order the return of certain religious items; and finally a catch all assertion that for all the reasons raised on appeal, the trial court abused its discretion.
 {¶ 4} As none of Ms. Pearlstein's contentions or Dr. Pearlstein's contentions has merit, we affirm.
 {¶ 5} Substantive and Procedural History
 {¶ 6} Ms. Pearlstein and Dr. Pearlstein married on May 25, 1997, and in the ensuing years had two children, Braden, who was born on January 13, 1999, and Benjamin Jr., who was born almost two years later, on August 30, 2000. Braden *Page 3 
currently attends a private school, while Benjamin Jr. goes to the local public school. The question of Benjamin's transfer to private school was undecided by the parties at the time of trial.
 {¶ 7} On September 6, 2006, Ms. Pearlstein filed for a divorce citing grounds of incompatibility and neglect. In turn, Dr. Pearlstein filed an answer and counterclaim for divorce citing grounds of incompatibility, adultery, and neglect. Both ultimately stipulated to incompatibility as grounds for the divorce.
 {¶ 8} Ms. Pearlstein left the marital home in September of 2006, pregnant with another man's child. She began an affair with Mr. Fred Shafer, who was doing some heating work on their home in the summer of 2006. Dr. Pearlstein continued to reside in the marital home and was awarded the house per the parties' stipulations.
 {¶ 9} The parties entered into extensive stipulations during and after the trial. The parties ultimately asked the court to decide the following nine issues: child custody support; the termination date of the marriage; the valuation of Dr. Pearlstein's 25% interest in his medical practice, Fifth Avenue Otolaryngologists, Inc.; the valuation of Ms. Pearlstein's interior design company, Pearl Interior Design; a division of a select list of certain household and marital property; spousal support; attorney fees; the tax dependency exemption for the children; as well as Dr. Pearlstein's motions to show cause and Ms. Pearlstein's motion to modify the temporary support.
 {¶ 10} A three-day trial was held before the magistrate on September 27, September 28, and October 1, of 2007. Each presented an expert witness addressing the valuation of Dr. Pearlstein's 25% interest in his medical practice. Mr. Robert G. *Page 4 
Turner testified on behalf of Ms. Pearlstein, and Mr. Frank C. Evans testified on behalf of Dr. Pearlstein.
 {¶ 11} Magistrate's Decision
 {¶ 12} The magistrate recommended in her decision filed December 17, 2007, that: (1) the parties be granted a divorce on the grounds of incompatibility; (2) the duration of the marriage be determined from May 25, 1997 to September 18, 2007; (3) the parties' stipulated parenting time agreement be ordered into execution; (4) Dr. Pearlstein pay child support in the amount of $799.28 per month per child plus 2% processing fees, and that in lieu of an upward deviation he be required to pay for the private school tuition for Braden, as well as Benjamin Jr., should he attend private school in the future, all extracurricular activities, and the uncovered medical expenses of the children; (5) Ms. Pearlstein's motion to modify the temporary support be denied; (6) Ms. Pearlstein be granted the tax dependency exemption; (7) Dr. Pearlstein pay $3,000 in monthly spousal support for twenty-eight months; (8) the parties' joint stipulation agreement be given effect in regard to the allocation of property and debt; (9) the value of Dr. Pearlstein's 25% interest in Fifth Avenue was $360,000; (10) Dr. Pearlstein's two motions for show cause be granted; (11) each party pay his or her own attorney fees except for moneys that were already paid from marital assets; and (12) court costs be equally divided. Finally, the magistrate determined that Dr. Pearlstein should make a lump sum payment of $397,230 to Ms. Pearlstein to equalize the property division.
 {¶ 13} Child Support
 {¶ 14} The parties entered into an agreement with regard to all issues relating to the children, including equal parenting time; however, the amount of child support, the *Page 5 
award of the tax dependency exception, and who should pay for the private school tuition and extracurricular activities remained at issue.
 {¶ 15} The court had ordered temporary monthly spousal support of $3,000 and temporary monthly child support of $3,000 during the pendency of the divorce action. Ms. Pearlstein then filed a motion to modify the temporary support, and argued at trial the support obligation should be increased as it was insufficient to maintain her and the children's standard of living, and further, that any increase should be applied retroactively to the date of the temporary support order. She argued that as a result of the insufficient support, she had to borrow money from her paramour (who is also her landlord,) her company, and her brother. She also claimed that because of insufficient support she was forced to amass a debt of over $12,000 on her credit card. Thus, she requested a total of $29,965 in retroactive support.
 {¶ 16} Dr. Pearlstein also claimed that he had to borrow money since the inception of the divorce from his sister and father for a total of $23,000. He has since repaid that amount and currently carries no balances on his credit cards.
 {¶ 17} The parties stipulated that Ms. Pearlstein has a gross annual income of $25,000 and Dr. Pearlstein, a gross annual income of $461,654. The magistrate further found, pursuant to R.C 3119.04(B), that since the combined gross income of both parents was greater than $150,000 per year, the proper amount of child support should be $1,736.91 per month.
 {¶ 18} The magistrate found no equitable basis for deviating from the child support guidelines, dismissing Ms. Pearlstein's argument that she was entitled to an upward deviation due to the disparity in the parties' incomes. The magistrate also *Page 6 
dismissed Dr. Pearlstein's argument that he was entitled to a downward deviation from the child support guidelines because of his equal parenting time with the children. She determined that in lieu of an upward deviation Dr. Pearlstein should pay: Braden's private school tuition, Benjamin Jr.'s private school tuition in the event that he should attend, and 100% of the children's extracurricular and uncovered medical expenses, including their camp fees.
 {¶ 19} Because the parties were unwilling to come to an agreement as to the tax dependency exemptions, the magistrate found that pursuant to the factors outlined in R.C. 3119.82, Dr. Pearlstein would receive a tax savings of $0, while Ms. Pearlstein would realize a tax savings of $957. Thus, due to the difference in the income of the parties (Dr. Pearlstein's income is eighteen times greater than that of Ms. Pearlstein), the magistrate recommended that the children would benefit if Ms. Pearlstein received the tax exemptions.
 {¶ 20} Findings Regarding Duration of Marriage
 {¶ 21} The magistrate determined that the termination date of the marriage was the first day of trial, September 27, 2007, rather than the de facto date of September 30, 2006, as argued by Dr. Pearlstein. The valuation date employed for Dr. Pearlstein's 25% interest in his medical practice was September 30, 2006. The magistrate explained that because both experts employed the valuation date of September 30, 2006, the use of a later date would be inequitable as a revaluation would cause needless expense and delay.
 {¶ 22} The magistrate further found that Ms. Pearlstein voluntarily vacated the marital home after filing for divorce, and the parties did not attempt to reconcile. They *Page 7 
remained in separate dwellings, but the marriage did not end when the parties physically separated. Dr. Pearlstein continued to contribute to Ms. Pearlstein's household expenses, the parties maintained their joint bank and investment accounts, and they continued to have an "equitable relationship." Furthermore, due to fluctuations in value of the parties' accounts over the past year, the magistrate found that to use a 2006 de facto termination date would be inequitable.
 {¶ 23} Division of Marital Property and Debt
 {¶ 24} As to the issues of marital property and debt, the parties were able to agree to a division of almost all of their assets and debts. In the parties' joint stipulation, and per their testimony at trial, they agreed that the Vanguard accounts for the children, worth $128,000 each, would be maintained for their benefit; that Ms. Pearlstein would retain her two Vanguard IRAs; and that Dr. Pearlstein would retain his Vanguard IRA. The Vanguard portfolio was at issue solely for the purpose of determining the termination date of marriage, and both parties agreed that the account would be evenly divided as of the court ordered termination date of their marriage.
 {¶ 25} Dr. Pearlstein also contended at trial that he had a separate interest in the Vanguard money market account in the sum of $32,000, which he received as an inheritance. No evidence was submitted tracing this as his separate property. Ultimately, the court found the Vanguard accounts were all marital property, and all the accounts would be evenly divided.
 {¶ 26} Valuation of Dr. Pearlstein's 25% Interest of the Fifth AvenueMedical Practice
 {¶ 27} During trial, each party presented expert testimony as to the value of Dr. Pearlstein's 25% interest in his Fifth Avenue medical practice, an ENT practice, which *Page 8 
he owns with three other doctors. Ms. Pearlstein presented the expert testimony of Mr. Robert G. Turner, Jr., who, using a gross accounts receivables method, valued Dr. Pearlstein's 25% interest in the practice at approximately $360,000. Dr. Pearlstein's expert, Mr. Frank C. Evans, using three different valuation methods, including the gross accounts receivable method, ultimately valued the practice at approximately $180,000.
 {¶ 28} The two experts disagreed as to whether the "goodwill" of the practice should be included or discounted, and as to whether lawsuits against the medical practice, that were since dismissed, should be included in the valuation equation. Mr. Turner included goodwill in his valuation and did not discount for the lawsuits because they were no longer pending, whereas Mr. Evans did not include goodwill in his valuation and discounted the value of the practice because of the lawsuits.
 {¶ 29} The magistrate found that goodwill should be included in the valuation of the business because it has been in existence for fifty years and has offices in three locations. After comparing the methods of discounts to the valuation, the magistrate specifically found Mr. Turner's report the more credible and sound of the two evaluations presented. Thus, the magistrate found Dr. Pearlstein's 25% share of the medical practice was worth $360,000 as of September 30, 2006.
 {¶ 30} Valuation of Pearl Interior Design
 {¶ 31} The magistrate found that Ms. Pearlstein is self-employed and the sole owner of an interior design company, Pearl Interior Design. Although Dr. Pearlstein raised the issue of the valuation of Pearl Interior Design at trial, no expert evaluations or testimony was offered by either party. Thus, the magistrate determined that "no evidence, expert or otherwise, was presented that substantiates an independent fair *Page 9 
market value for this business," and assigned the valuation of Pearl Interior Design at $0.
 {¶ 32} Household Items
 {¶ 33} With the exception of a few items, the parties agreed to each keep the household goods already in their possession. Ms. Pearlstein requested the chandelier in the master bedroom that was given to her by her parents, a Lladro warrior figurine, pictures of the children, and the baby furniture in the basement. Dr. Pearlstein agreed during trial that Ms. Pearlstein could keep the laptop computer, but argued that he should be reimbursed $35,000 for the computer and other items he had to replace after Ms. Pearlstein left the marital residence. The magistrate, in her decision, reminded Dr. Pearlstein that with the exception of a few items, marital property had already been divided by agreement and that there were two desktop computers at the martial residence in addition to the laptop computer in Ms. Pearlstein's possession. Ms. Pearlstein agreed during trial to return Dr. Pearlstein's mother's ring, and the magistrate ordered that Dr. Pearlstein provide Ms. Pearlstein with copies of the camcorder videos, black and white photographs of the children, and give Ms. Pearlstein her personal files.
 {¶ 34} The Court's Conclusions
 {¶ 35} Both parties timely filed their objections to the Magistrate's Decision.

Wife Husband
Pearl Interior Design $0 Woodberry Home 215,150
Bal. of Vanguard Accts ½ Bal. of Vanguard Accts ½
John Hancock 401(K) ½ John Hancock 401(K) ½
 *Page 10 
American Funds 401(K) ½ American Funds 401(K) ½
All Vanguard IRAs ½ All Vanguard IRAs ½
Lin Waldock Acct 6,000 Valley Hospital 32,074
Huntington Bank Acct. (flowthru) 5th Avenue Practice 360,000
Capital Account ($8,938) ORL (building) 52,298
 Southwoods 132,000
 Key Bank Acct. (flowthru)
 Nat'l City Acct. (flowthru)
 Capital One Visa -0-
 Nat'l City Visa -0-
 Saks Acct. -0-
Subtotal: (2,938) Subtotal: 791,522
Payment to Equalize: 397,230 Payment to Equalize: (397,230)
Total: 394,292 394,292

 {¶ 36} The court, affirmed, with some modification. The court also adopted the parties' written stipulations, the stipulations agreed to at trial, and the parties' shared parenting plan. The court allocated the martial property and debt as follows:
 {¶ 37} The court ordered that the equalization payment be made on or before August 15, 2008.
 {¶ 38} As for the household items at issue, the court ordered that Dr. Pearlstein give Ms. Pearlstein copies of video tapes, the children's birth certificates and social security cards, the children's black and white portraits, the china, her personal files, one-half of the wedding gifts, the Lladro figurine, the chandelier from the master bedroom, and the baby furniture within thirty days of the judgment entry. Ms. Pearlstein was ordered to return Dr. Pearlstein's mother's ring within the same period of time. All of the property that was in the possession of either party that was not specifically covered was awarded as separate property; similarly, all debt incurred by either party that was not covered by the entry was determined to be the separate debt of each party.
 {¶ 39} The court ordered Dr. Pearlstein to pay child support in the amount of $799.28 per month per child, plus 2% processing fees.
 {¶ 40} Dr. Pearlstein was also ordered to pay spousal support of $3,000 per month plus 2% processing fees for twenty-eight months. The court ordered $5,000 in attorney fees as additional spousal support to be paid on or before August 30, 2008. *Page 11 
 {¶ 41} The court found Ms. Pearlstein guilty of contempt for violations of prior orders, and she was fined $500.
 {¶ 42} Ms. Pearlstein timely appealed, raising one assignment of error:
 {¶ 43} "The trial court erred and abused its discretion in its determination of child support."
 {¶ 44} Dr. Pearlstein cross-appealed, raising twelve assignments of error:
 {¶ 45} "[1.] The trial court abused its discretion in failing to find a de facto termination date of September 30, 2006, of the parties' marriage.
 {¶ 46} "[2.] The trial court abused its discretion in finding that appellee/cross-appellant's 25% share in his medical practice was worth $360,000.
 {¶ 47} "[3.] The trial court abused its discretion in failing to assign a value to appellant/cross-appellee's business.
 {¶ 48} "[4.] The trial court abused its discretion in failing to require appellant/cross-appellee to pay her portion of the marital debt and/or in failing to credit appellee/cross-appellant with his payment of marital debt.
 {¶ 49} "[5.] The trial court abused its discretion in failing to find a separate interest in the parties' Vanguard account where testimony regarding said separate interest was unrefuted.
 {¶ 50} "[6.] The trial court abused its discretion in failing to address the management of the children's accounts where the parties agreed to joint management.
 {¶ 51} "[7.] The trial court abused its discretion in dividing personal property other than as provided for in the stipulations adopted by the court. *Page 12 
 {¶ 52} "[8.] The trial court abused its discretion in failing to consider the tax consequences of its property division.
 {¶ 53} "[9.] The trial court abused its discretion when it: a) ordered appellee to pay a lump-sum for attorney fees by a date certain; b) failed to order appellant to reimburse appellee for marital funds unilaterally withdrawn by appellant for fees to initiate the divorce action; and c) when it failed to order the amount determined by the trial court to have been incurred by appellee in prosecution of his contempt motion to be paid to appellee.
 {¶ 54} "[10.] The trial court abused its discretion in failing to order appellant/cross-appellee to return religious items to appellee following a finding of contempt against appellant for taking said items in violation of a restraining order prohibiting said taking.
 {¶ 55} "[11.] The trial court abused its discretion when it failed to order into effect the parties' agreement regarding the payment of the children's uncovered medical expenses.
 {¶ 56} "[12.] The trial court abused its discretion in adopting the Magistrate's Decision regarding all of the issues presented for review and argument herein for all of the reasons set forth herein."
 {¶ 57} Wife's Claim that the Child Support Order is Insufficient
 {¶ 58} In her sole assignment of error, Ms. Pearlstein contends that the trial court erred and abused its discretion in its determination of child support. Specifically, she argues that the trial court failed to consider the needs and standard of living of the children as it set the monthly child support payment at $799.28 per month, per child, *Page 13 
plus 2% processing fees. She also argues that the court erred in basing its determination of child support on a speculative, future occurrence by ordering Dr. Pearlstein to pay for Benjamin Jr.'s private school tuition should the parties decide he should transfer in the future. Because we find no abuse of discretion in the court's determinations, we affirm.
 {¶ 59} "A trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed save a showing of an abuse of discretion." Longo v. Longo, 11th Dist. No. 2004-G-2556, 2005-Ohio-2069, ¶ 62, citing Pauly v. Pauly,80 Ohio St.3d 386, 390.
 {¶ 60} After affirming the magistrate's decision, with some modification, the trial court ordered Dr. Pearlstein to pay Ms. Pearlstein $799.28 per month per child, plus 2% processing fees. In recommending this amount, the magistrate specifically noted that in lieu of an upward deviation due to the disparity in the parties' income, Dr. Pearlstein should also pay Braden's private school tuition, as well as Benjamin Jr.'s, should he attend private school in the future. In addition, Dr. Pearlstein was ordered to pay the religious education fees, fees for all the extracurricular activities of the minor children, both of whom are actively involved in sports and go to summer camp at a cost of approximately $3,000, and 100% of all of the uncovered medical expenses.
 {¶ 61} Ms. Pearlstein asserts that the trial court erred in capping Dr. Pearlstein's child support obligation at $150,000 based on the combined gross income of the parties, arguing that she is entitled to an upward deviation because the trial court did not consider all the relevant factors set forth in R.C. 3119.23. Ms. Pearlstein argues that even with the added costs of the private school tuition, which results in Dr. Pearlstein *Page 14 
effectively paying $3,248.57 per month, this is still an insufficient and unjust amount. She argues it is not in the best interests of the children, especially considering their former high standard of living, which they still enjoy when they are with Dr. Pearlstein.
 {¶ 62} Upward Deviation in High Income Cases
 {¶ 63} Pursuant to R.C. 3119.04(B), the court is not required to award an upward deviation where the parties' combined gross income exceeds $150,000. The parties stipulated that Ms. Pearlstein's gross income is $25,000 and that Dr. Pearlstein's gross income is $461,654.
 {¶ 64} R.C. 3119.04(B) provides:
 {¶ 65} "(B) If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, * * *, shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjustor inappropriate and would not be in the best interest of the child,obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, the determination, and findings." (Emphasis added.)
 {¶ 66} The magistrate concluded, and the trial court agreed, that in lieu of an upward deviation from the $150,000 cap on the child support guidelines, Dr. Pearlstein would pay 100% of the children's uncovered medical expenses, private school tuition, *Page 15 
and all the expenses for the extracurricular activities of the boys, including camps, in addition to his child support obligation. Although the court did not deviate from the child support guidelines per R.C. 3119.04(B), the court clearly stated that these extra expenses were in lieu of an upward deviation. Further, the magistrate noted that Ms. Pearlstein would receive over $900 in tax exemptions and that she could use those additional funds to pay for activities with her children.
 {¶ 67} We determine there is no abuse of discretion in the court's child support award as "a trial court should tread carefully when determining to award a child support amount that is greater than that necessary to cover the current needs of the children; awarding a higher amount in this situation could encroach on [Ms. Pearlstein's] own common law duty to support the children." Ohlemacher v. Ohlemacher, 9th Dist. No. 04CA008488, 2005-Ohio-474, ¶ 36, citing Jarvis v. Witter, 8th Dist. No. 84128, 2004-Ohio-6628, ¶ 90-92, Haskins v. Bronzetti (1992),64 Ohio St.3d 202, 205; see Bryant v. Bryant (Jan. 28, 1999), 5th Dist. No. 97CA8 98CA1, 1999 Ohio App. LEXIS 752 ("stating that in high-income cases, the support obligation calculated usually exceeds the amount actually required to provide for the children, but that allocating an amount to satisfy the standard of living requirement runs the risk of making the award `less like child support and more like an equalization of the incomes of the two household'").
 {¶ 68} Ms. Pearlstein also argues that the order compelling Dr. Pearlstein to pay for Benjamin Jr.'s private school tuition, in the event that he transfers, is in error in that it is a speculative, future occurrence, and should not have been considered for purposes of calculating the current support obligation. She also argues that an assumption that Braden will remain in private school until graduation is also speculative. *Page 16 
 {¶ 69} We fail to see how this determination is an abuse of discretion.
 {¶ 70} The record demonstrates that the parties chose to send Braden to a private school and that they also chose to enroll their children in numerous extracurricular activities, which enrich their boys' lives and foster their development. Given these choices and considering the parties' own level of education, it is not unreasonable to anticipate that private school will remain an integral part of Braden's life and most probably part of Benjamin's life.
 {¶ 71} It is well established that "[p]rivate school tuition is a form of child support." Roberts v. Roberts, 12th Dist. Nos. CA2004-04-081 and CA2004-04-087, 2005-Ohio-2792, ¶ 21, citing Hammel v. Klug, 12th Dist. Nos. CA2004-04-032 and CA2004-04-033, 2004-Ohio-6242, ¶ 11, citingKaiser v. Kaiser (Dec. 6, 2001) 8th Dist. No. 78550, 2001 Ohio App. LEXIS 5415. Further, "[i]n contemplating a child support deviation, a court may consider the educational opportunities that would have been available to the child had the circumstances requiring a court order for support not arisen." Id., citing Hammel; R.C. 3119.23(N).
 {¶ 72} "In addition, a trial court can award child support for private school tuition when necessary." Id. at ¶ 22, see Smith v. Null (2001),143 Ohio App.3d 264, 270 ("statutory scheme permits trial court to award child support above and beyond the standard amount, which would include authority to make such an award for purposes of private school tuition when necessary").
 {¶ 73} We are puzzled as to why Ms. Pearlstein would now contest the award of private school tuition for Braden and Benjamin Jr., should he choose to attend, when she argued during trial that Dr. Pearlstein should pay for the children's tuition. *Page 17 
Considering the parties' income and the child support award as a whole, we find no abuse of discretion in the trial court's determination that Dr. Pearlstein pay for the children's private schooling. Indeed, Ms. Pearlstein testified that she wants the children to attend private school.
 {¶ 74} Thus, we determine that the trial court did not abuse its discretion as the court set forth, pursuant to R.C. 3119.04(B), the child support obligation is based "on the qualitative needs and standard of living of the children and parents." Longo at ¶ 91, citing R.C. 3119.04(B); see, also, Zeitler v. Zeitler, 9th Dist. No. 04A008444,2004-Ohio-5551, ¶ 8, Cho v. Cho, 7th Dist. No. 03 MA 73, 2003-Ohio-7111.
 {¶ 75} The record also demonstrates that the court below fully considered all factors including the financial resources and needs of both parents. The magistrate noted Ms. Pearlstein has a new baby, fathered by her paramour, she pays $3,000 in monthly "rental" payments to live in a home owned by him; her claimed monthly expenses were inflated by approximately $7,600; and her parents live with her and have the means to contribute toward her household expenses. These factors do not translate into a basis to increase support obligations. Rather, these factors relate to her lifestyle needs and not the standard of living or the needs of the children.
 {¶ 76} Our review indicates the court properly determined what qualified as "necessaries" and the standard of living in the context of a high-income family, and then crafted an appropriate support order. Quite simply, Ms. Pearlstein fails to demonstrate what monetary amount would cover the children's needs that the child support order currently does not cover and how the amount awarded fails to sufficiently address those needs and their standard of living enjoyed in the past. *Page 18 
 {¶ 77} Ms. Pearlstein's assignment of error is without merit.
 {¶ 78} Division of Marital Property and Debt
 {¶ 79} Standard of Review
 {¶ 80} In his twelve assignments error, Dr. Pearlstein raises issues regarding the court's distribution of the marital property and debt. "A trial court is given broad discretion in the division of marital assets." Rice v. Rice, 11th Dist. Nos. 2006-G-2716 and 2006-G-2717,2007-Ohio-2056, ¶ 27, citing Cherry v. Cherry (1981), 66 Ohio St.2d 348, paragraph two of the syllabus. "Therefore, we will not disturb the trial court's distribution of marital property absent an abuse of discretion. * * * An abuse of discretion connotes more than a mere error of law or judgment; rather it implies the trial court's attitude was unreasonable, arbitrary, or unconscionable." Id., citing Measor v. Measor,160 Ohio App.3d 60, 2005-Ohio-1417, ¶ 9, citing Booth v. Booth (1989),44 Ohio St.3d 142, 144, and Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
 {¶ 81} With the exception of assignments of error one, two, three, and eight, Dr. Pearlstein failed to brief the remaining eight assignments of error as no authorities are offered in support of his arguments. "An appellate court is empowered to disregard an assignment of error presented for review due to a lack of briefing by the party presenting that assignment. Proper appellate briefing standards are set forth in App. R. 16(A)." Keating v. Keating, 11th Dist. No. 90611, 2008-Ohio-5345, ¶ 111, quoting Cireddu v. Cireddu (Sept. 7, 2000), 8th Dist. No. 76784, 2000 Ohio App. LEXIS 4076. As these assignments were not briefed, they should be disregarded "due to the complete lack of argument containing reasons in support of the contention and citations *Page 19 
to authority." Id., quoting Cireddu at 24. We will, however, address those arguments on their merits.
 {¶ 82} De Facto Termination Date
 {¶ 83} In his first assignment of error, Dr. Pearlstein argues that the trial court erred in failing to find that the termination date of the marriage was September 30, 2006, the date he cross-filed for divorce. Dr. Pearlstein contends that the trial court erred in determining the date of termination was the first day of the final hearing, September 17, 2007, because the court specifically found that: Ms. Pearlstein was pregnant with another man's child; she filed for a divorce on September 6, 2006; she moved from the marital residence in September of 2006 and is currently renting a home in addition to borrowing money from her baby's father; there was no attempt at reconciliation between the parties; the date of September 30, 2006, was the date of valuation for medical practice; and further, her parents contributed to her living expenses.
 {¶ 84} We find no abuse of discretion in the court's determination that the marriage terminated on September 17, 2007. We also agree with the trial court that the use of the earlier date of September 30, 2006, for the sole purpose of the valuation of the practice is equitable as it avoids the needless expense of a revaluation when both experts used the earlier date.
 {¶ 85} We agree with the magistrate's finding that Ms. Pearlstein's unilateral decision to vacate the marital dwelling did not, in and of itself, compel a finding that the marriage terminated de facto as of September 2006. The magistrate disagreed with Dr. Pearlstein's contentions that because his wife was pregnant with another man's child, *Page 20 
the parties' did not attempt to reconcile, and they remained in separate dwellings, the marriage was terminated. Rather, the magistrate appropriately found that the financial contributions and relationship did not end when they physically separated. Dr. Pearlstein continued to contribute to Ms. Pearlstein's household expenses, the parties maintained their joint accounts, and they continued to have an equitable, intertwined relationship. We also agree that given the fact that the account balances on the parties' martial assets fluctuated during the year after separation, an earlier 2006 date would be inequitable.
 {¶ 86} "A trial court may use the date of final hearing, or, if that is inequitable, another date it chooses in determining the termination of a marriage for purposes of property division." Nitschke v.Nitschke, 11th Dist. No. 2006-L-198, 2007-Ohio-1550, ¶ 26, quoting R.C. 3105.171(A)(2)(a) and (b); Marini v. Marini, 11th Dist. Nos. 2005-T-0012 and 2005-T-0059, 2006-Ohio-3775, ¶ 11. "The analysis in determining a `de facto' termination date for a marriage is, essentially, factual, and includes: (1) whether the parties separated; (2) whether they made an attempt at reconciliation; (3) whether they continually maintained separate residences; and, (4) whether they maintained separate business or financial arrangements." Id., citing Marini at ¶ 13. "An appellate court may not overturn a trial court's determination of a de facto termination date for a marriage, if there is any evidence in the record to support it." Id., citing Marini at ¶ 12.
 {¶ 87} While "[a]s a general matter, a trial court should consistently apply the same set of dates when valuing marital property that is subject to division and distribution in a divorce proceeding * * * this court has previously held that `the circumstances of some cases may require the use of different dates for valuation *Page 21 
purposes[.]'" Weller v. Weller, 11th Dist. No. 2006-G-2723 and 2006-G-2724, 2007-Ohio-4964, ¶ 29, quoting Coble v. Gilanyi (Dec. 23, 1999), 11th Dist. No. 97-T-0196, 1999 Ohio App. LEXIS 6267, 9, citingMiller v. Miller (May 24, 1996), 11th Dist. No. 95-G-1942, 1996 Ohio App. LEXIS 2188, 4.
 {¶ 88} As long as the trial court adequately explains its reasons for choosing a different valuation for certain martial assets, it may do so. R.C. 3105.171(G) requires that the "`trial court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of during the marriage.'" Id., citingCottage v. Cottage (June 13, 1997), 11th Dist. No. 96-T-5412, 1997 Ohio App. LEXIS 2592, quoting R.C. 3105.171(G). Thus, as the court explicitly made such findings of fact in its determination, there is no abuse of discretion evidenced by a dichotomy of dates.
 {¶ 89} A review of the record reveals that Dr. Pearlstein testified that he attempted to reconcile after September of 2006. Both parties withdrew funds in the amount of $35,000 each to pay their separate debts and attorney fees from the Vanguard money market account; and their marital accounts and expenses were so intertwined until the actual hearing that to use an earlier date would be inequitable in this case. Furthermore, the debts of the parties that were not explicitly divided between the parties were ordered to remain separate. Thus, the marital assets are not being depleted by either party's separate debt that had accumulated in the ensuing months.
 {¶ 90} The determination of the termination date of a marriage is largely a question of fact. Thus, we defer to the trial court's conclusion that to use an earlier "de facto" date would be inequitable based on the facts of this case, where the parties have *Page 22 
a large amount of combined assets that have supported both of them since each filed for divorce in September of 2006, and which have fluctuated throughout the course of the year until the actual hearing. It would be inequitable to find otherwise.
 {¶ 91} The Third District Court of Appeals recently stated in Dill v.Dill, 179 Ohio App.3d 14, 2008-Ohio-5310, that "[a] de facto termination of marriage must be `clear and bilateral, not unilateral;' thus the `unilateral decision' of one spouse to leave the marital residence does not, in and of itself, constitute a de facto termination of marriage." Id. at ¶ 11, citing Day v. Day (1988), 40 Ohio App.3d 155, 158. The court reversed the trial court's failure to find a de facto termination where the parties had been separated for over ten years, noting that this occurred in only the rarest of cases, and that "the one common factor among the cases reversed on appeal was that `a great deal of time elapsed between the date of separation and the date of the final hearing.'" Id. at ¶ 12 (citations omitted).
 {¶ 92} This case is remarkably different in that although the parties maintained separate residences, separate business activities, and separate bank accounts, they did so per court order, while also maintaining their joint accounts. Dr. Pearlstein continued to contribute and support Ms. Pearlstein, and Dr. Pearlstein himself testified that he attempted to reconcile, but that Ms. Pearlstein refused. Both parties paid their attorney fees and the guardian ad litem fees from marital funds, and the time of separation to divorce was approximately twelve months.
 {¶ 93} Dr. Pearlstein's first assignment of error is without merit.
 {¶ 94} Expert Valuation of Fifth Avenue *Page 23 
 {¶ 95} Dr. Pearlstein contends in his second assignment of error that the trial court erred in concluding that his 25% share of his medical practice should be valued at $360,000. Basically, Dr. Pearlstein argues that the trial court abused its discretion in concluding that Ms. Pearlstein's expert evaluator, Mr. Turner, was more accurate in his assessment of the practice than Dr. Pearlstein's evaluator, Mr. Evans. Dr. Pearlstein contends that Mr. Turner's opinions should be disregarded because he included goodwill in his valuation, he did not have complete access to the practice's financial data like Mr. Evans, and further, that Mr. Evans used three different valuation methods in coming to his conclusion, including the sole capitalization method that Mr. Turner used. We disagree with this contention and find no abuse of discretion in the court's determination of the value of the practice or its determination that Mr. Turner's evaluation was more credible.
 {¶ 96} "A trial court's ruling as to the admission or exclusion of expert testimony is within its broad discretion and will not be disturbed absent an abuse of discretion." Biro v. Biro, 11th Dist. No. 2006-L-068 and 2006-L-236, 2007-Ohio-3191, ¶ 28, citing State v.Armstrong, 11th Dist. Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, ¶ 52, citing State v. Tomlin (1992), 63 Ohio St.3d 724, 728.
 {¶ 97} Evid. R. 702 governs the admissibility of expert testimony. It provides:
 {¶ 98} "A witness may testify as an expert if all of the following apply:
 {¶ 99} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; *Page 24 
 {¶ 100} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 101} "(C) The witness' testimony is based on reliable, scientific, technical, or other specialized information. * * *"
 {¶ 102} Mr. Turner's testimony established his qualifications as an expert capable of giving an opinion on the valuation of the practice. Clearly, and Dr. Pearlstein does not contest, Mr. Turner possesses the necessary qualifications to testify as an expert, thus meeting the first two prongs of Evid. R. 702.
 {¶ 103} Dr. Pearlstein argues, however, that Mr. Turner's methodology is flawed because he did not conduct a site visit, speak directly with him, contact the office manager, or speak with the practice's accountant. We must note at the outset that these particular arguments are undercut by facts establishing Mr. Turner attempted to contact the practice's offices and Dr. Pearlstein, but Dr. Pearlstein never responded to any of Mr. Turner's requests. Thus, Mr. Turner based his data on the financial records of the practice, information from the practice's website, and economic and industry data of medical practices.
 {¶ 104} Dr. Pearlstein also argues that his expert's evaluation is more credible because his expert used three different types of analyses before reaching his determination that Dr. Pearlstein's 25% interest in the medical practice was $180,000. He contends that his wife's expert wrongly considered the goodwill of the practice and did not discount for lawsuits that were subsequently dismissed as his expert did. We do not find that consideration of goodwill and no discount for the lawsuits rendered the capitalization method utilized by Ms. Pearlstein's expert flawed. *Page 25 
 {¶ 105} "[I]n determining whether expert testimony is reliable, the focus must be on whether the principles and methods used to reach an opinion are reliable, not whether the conclusions are correct." Id. at ¶ 34, citing Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611. See, also, Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993),509 U.S. 579, 592-593. "The `ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's "technique or principle [is] sufficiently reliable so that it will aid [the trier of fact] in reaching accurate results."'" Id., quoting Armstrong at ¶ 63.
 {¶ 106} Both experts used the capitalization method, however, each applied it differently, and used different discounting methods because they had different opinions as to whether the non-compete agreement, the "goodwill" of the practice, and the once pending lawsuits should be included and/or discounted.
 {¶ 107} In Mr. Evan's opinion, the non-compete agreement reduced the overall value of Dr. Pearlstein's interest. He also disagreed with the specific database Mr. Turner used in applying the capitalization method. Mr. Evans discounted for future growth rate since he believed revenues would be largely stagnant, while expenses would increase. He applied a discount for the dismissed lawsuits, and did not know if this change would alter his valuation if he were to assess the practice now. Finally, he did not remember some of the other discounts he applied.
 {¶ 108} Mr. Evans used three different methods to value the business and then weighed each according to their "confidence" level before reaching his final valuation. Using the excess earnings method, he estimated the value to be $256,000, again not accounting for goodwill and applying a negative earnings value. Using the same *Page 26 
method as Mr. Turner, the capitalization method, Mr. Evans arrived at a valuation of $155,000. Mr. Evans opined the valuation was so different because the largest source of income was not from Dr. Pearlstein's 25% interest in the practice, but rather from Dr. Pearlstein's income as a practicing physician. Using the direct market data method, he arrived at a valuation of $260,000. Mr. Evans then analyzed all three approaches to reach a "confidence level" where he weighed each method. Mr. Evan's ultimate valuation of Dr. Pearlstein's 25% interest in the medical practice was $180,000.
 {¶ 109} We find no abuse of discretion in the magistrate's determination that Mr. Turner's valuation was more credible than Mr. Evans. The magistrate concluded that the large disparity between the valuations was attributed to the different methods employed, and that Mr. Turner included goodwill, while Mr. Evans discounted for the dismissed lawsuits and did not include goodwill.
 {¶ 110} The magistrate found that some of the methods used by both experts were similar as they both utilized the gross accounts receivables, although Mr. Turner discounted, whereas Mr. Evans did not. Both experts used methods that assumed the continued operation of the medical practice; the value of the equipment, patient records, accounts receivable, furnishings, and lease rights; as well as the net tangible assets. The magistrate also determined that "goodwill" was properly factored into Mr. Turner's evaluation because the practice has been in existence for more than fifty years and has offices in three locations. Further, the magistrate found that Mr. Turner's failure to visit the medical practice was not fatal to his valuation, nor did it make it less credible. The magistrate concluded that "Mr. Turner's consideration of Goodwill and his consideration that the lawsuits were dismissed, along with his testimony supports his finding that the *Page 27 
fair market value of Fifth Avenue is $360,000. His report is the most credible and sound of the two evaluations presented."
 {¶ 111} "In Rodriguez v. Rodriguez (Apr. 13, 1990), 11th Dist. No. 89-G-1498, 1990 Ohio App. LEXIS 1448, this court observed that `* * * conflicting testimony and the resolution of which [appraised] value to accept is a question of credibility of the witness that is to be determined by the trier of fact.'" Reiling v. Smith, 11th Dist. No. 2006-G-2705, 2007-Ohio-3370, ¶ 28, quoting Rodriguez at 3. As in this case, "[e]ach of the two appraisals placed different emphasis upon unique factual features of the subject property. `"It is unfortunate, but true, that experts, like the rest of mankind, may take a given set of facts and draw absolutely divergent conclusions therefrom. It thus becomes necessary for some tribunal to make [a] determination of the correctness of the opposite conclusions."'" Id., citingRodriguez at 4, citing Springfield Gas Co. v. Herman (1933),46 Ohio App. 309, 311.
 {¶ 112} We find no abuse of discretion in the magistrate's determination that Mr. Turner's valuation was more credible and we agree that the "goodwill" of the practice should be included and that the dismissed lawsuits should not have been discounted. The divergence of opinions does not affect the admissibility of the opinion. Indeed, "[a]ny weaknesses in the factual underpinnings of expert testimony goes to the weight and or credibility of the testimony, rather than its admissibility." Biro at ¶ 39, quoting Seminatore v. Climaco, Climaco,Lefkowitz Garofoli Co., L.P.A. (Dec. 7, 2000), 8th Dist. No. 76658, 2000 Ohio App. LEXIS 5732, 32. Furthermore, Dr. Pearlstein's counsel skillfully cross-examined Mr. Turner to cast doubt on his credibility, but in the end, we cannot say that the magistrate abused her discretion in accepting Mr. Turner's *Page 28 
valuation over Mr. Evans and determining the value of Dr. Pearlstein's 25% interest in the medical practice was $360,000.
 {¶ 113} Dr. Pearlstein's second assignment of error is without merit.
 {¶ 114} Valuation of Pearl Interior Design
 {¶ 115} In his third assignment of error, Dr. Pearlstein contends that the trial court erred in failing to assign a value to Ms. Pearlstein's interior design company, Pearl Interior Design. We find no abuse of discretion in the trial court's determination that this company has no value.
 {¶ 116} As already noted, "[a]n appellate court reviews a determination regarding the valuation of property for an abuse of discretion." Smith at ¶ 24, see, e.g. Boyles v. Boyles, 11th Dist. No. 2002-P-0097, 2003-Ohio-5351, ¶ 38.
 {¶ 117} The magistrate found that "no evidence, expert or otherwise, was presented that substantiates an independent fair market value for this business." We find no abuse of discretion in this determination as our review of the record reveals the same. The only evidence before the trial court related to profits, which were marginal at best, and none was offered as to value.
 {¶ 118} Specifically, Ms. Pearlstein testified that she started Pearl Interior Design about two years ago. The tax return for the business in 2006 evidenced a profit of $8,700, and she testified that there would be no profit from 2007. In her opinion, the business has no independent value. On cross, she testified that the account for the business was mostly a "flow-through" account between the vendors and her clients, as her efforts consist of interior design and the purchase of the decorative materials and furnishings. *Page 29 
 {¶ 119} Dr. Pearlstein testified that he helped Ms. Pearlstein begin the business in 2005, and that he did the principal accounting and set up of the 401(k) until July of 2006. He testified that the $28,000 received in 2006 was not due to gross sales, but was, rather, the gross income after paying off the contracts with the vendors.
 {¶ 120} We agree that neither party provided any evidence of a valuation, expert or otherwise. One year of income and expense data does not equate to an evaluation. Thus, we find no abuse of discretion in the court's valuation of Pearl Interior Designs at $0.
 {¶ 121} Dr. Pearlstein's third assignment of error is without merit.
 {¶ 122} Payment of the Marital Debt During Pendency of theDivorce
 {¶ 123} In his fourth assignment of error, Dr. Pearlstein contends the court failed to reallocate marital debt in consideration of the fact that Dr. Pearlstein paid guardian ad litem fees, the parties' income tax and real estate taxes, and the tax preparation fees. Thus, Dr. Pearlstein contends that the trial court failed to credit him for expenses that totaled approximately $60,000. Dr. Pearlstein's contention is without merit as this amount was accounted for in the division of the Vanguard portfolio per the parties' stipulation that "[t]he balance of the Vanguard portfolio shall be equally distributed between Lori and Richard Pearlstein after accounting for each having received $35,000from the Money Market Prime Account per the agreed order regardingsame." (Emphasis added.)
 {¶ 124} More fundamentally, the reallocation of debt argument was neither before the magistrate nor the court when their decisions were rendered, and Dr. Pearlstein fails to cite to any authority in support of his argument on appeal. Keating at ¶ 111. *Page 30 
 {¶ 125} Dr. Pearlstein's fourth assignment of error is without merit.
 {¶ 126} A Portion of the Vanguard Account as Separate Property
 {¶ 127} In his fifth assignment of error, Dr. Pearlstein contends the trial court abused its discretion in failing to find that he had some separate interest in the parties' joint Vanguard account. He argues that because he testified at trial, and Ms. Pearlstein agreed, that he received approximately $35,000 as an inheritance from his parents that he deposited into the parties' joint account, the trial court failed in crediting him this portion as separate property. We find no abuse of discretion in the trial court's determination that his $35,000 deposit into the joint account was marital property as the parties' jointly stipulated to divide the money market account evenly, and no evidence was offered to trace the funds directly from his inheritance.
 {¶ 128} The magistrate specified this portion of the joint stipulation in reaching her conclusion that the evidence did not substantiate a separate claim of $35,000 in the Vanguard portfolio, stating:
 {¶ 129} "76. Stipulation #18 describes the account as including a Money Market account. Stipulation #19 discusses the fact that the Vanguard portfolio consists of accounts to be maintained for the benefit of the children with approximate values of $128,500 each. Stipulation #20 provides that Lori Pearlstein is to retain her two Vanguard IRAs. Stipulation #21 provides that Richard Pearlstein will retain his Vanguard IRA. Stipulation #22 states as follows: `The balance of the Vanguard portfolio shall be equally allocated between LORI and RICHARD PEARLSTEIN after accounting for each having received $35,000 from the Money Market Prime account per the Agreed Order regarding same.'" *Page 31 
 {¶ 130} Thus, the parties' stipulated that the Vanguard account would be equally divided and that the only issue remaining for trial as to the Vanguard accounts was the de facto termination date of the marriage.
 {¶ 131} In addition, no evidence was offered as to the three checks, totaling approximately $32,000, that were deposited into the account as part of the inheritance. Based upon the parties' October 12, 2007 stipulation, the lack of any tracing, and the fact that Dr. Pearlstein failed to support his argument with authorities, we find no abuse of discretion in the court's conclusion. Keating at ¶ 111.
 {¶ 132} Dr. Pearlstein's fifth assignment of error is without merit.
 {¶ 133} Joint Management of the Children's Accounts
 {¶ 134} In his sixth assignment of error, Dr. Pearlstein contends that the trial court abused its discretion in failing to address the management of the children's accounts because they agreed to such an arrangement in open court. Dr. Pearlstein argues that the trial court failed to address the parties' agreement. We find this contention to be wholly without merit as the court specifically addressed the joint management of the children's accounts in its judgment entry as per the parties' agreement in open court and their joint stipulation of October 12, 2007.
 {¶ 135} Specifically, the magistrate found in the proposed property division section of her decision, that the proposed division "specifically takes into account the parties' stipulation that the children's vanguard accounts be maintained for their benefit ($128,000 each); * * *." Further on in her decision she finds that: "[a]ll property of the minor children should be preserved by the party having custody of it and should not be dissipated without the consent of the other party or order of [sic] court." The court *Page 32 
adopted the magistrate's decision, and ordered the same in its judgment entry stating: "* * * all property of the minor children shall be preserved by the party having possession of it and shall not be dissipated without the consent of the other party, or order of the Court."
 {¶ 136} Thus, we fail to see how the trial court abused its discretion since it explicitly recognized the parties' stipulation that these accounts would be jointly managed, and further, ensured joint management by ordering that neither could dissipate the accounts without the consent of the other or by a court order. Moreover, Dr. Pearlstein failed to fully brief this issue or offer any authority in support of his contention. Keating at ¶ 111.
 {¶ 137} Dr. Pearlstein's sixth assignment of error is without merit.
 {¶ 138} Household Goods
 {¶ 139} In his seventh assignment of error, Dr. Pearlstein contends that the trial court abused its discretion in failing to follow the parties' joint stipulation as to certain household goods. Specifically, he contends that the trial court erred in ordering Dr. Pearlstein to make available to Ms. Pearlstein the children's birth certificates and social security cards; as well as the china, half of the wedding gifts, the Lladro figurine that was at issue at trial, the chandelier in the master bedroom that was given to Ms. Pearlstein by her parents, and the baby furniture that was stored in the basement. We find this argument to be wholly without merit.
 {¶ 140} Furthermore, Dr. Pearlstein did not cite to any authority in support of his assertions and fully brief the issue as required.Keating at ¶ 111. *Page 33 
 {¶ 141} Thus, the trial court did not abuse its discretion and Dr. Pearlstein's seventh assignment of error is without merit.
 {¶ 142} Tax Consequences
 {¶ 143} In his eighth assignment of error, Dr. Pearlstein contends that the trial court abused its discretion in failing to consider the tax consequences of its property division. Specifically, Dr. Pearlstein contends that the trial court erred in failing to consider the tax consequences that are associated with his non-liquid assets. We find no abuse of discretion in the court's failure to set forth specific consideration of the tax consequences of the property division. Dr. Pearlstein offered no evidence as to any tax consequence during trial, and more importantly, failed to raise the issue in his objections to the magistrate's decision; thus he has waived his right to assert this argument on appeal.
 {¶ 144} At the outset, we must note that "[t]he limits of our review are circumscribed. Civ. R. 53(D)(3)(b)(iv) provides that any error, factual or legal, in a magistrate's decision is waived, except `plain error,' unless a party files objections compliant with Civ. R. 53. Since [Dr. Pearlstein] failed to file any objections to the magistrate's decision or raise this issue at trial, we may review only for plain error." Nitschke at ¶ 19, citing Diffenbacher v. Diffenbacher, 11th Dist. No. 2005-L-074, 2006-Ohio-2238, ¶ 24. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging *Page 34 
the legitimacy of the underlying judicial process itself." Id. at ¶ 20, quoting Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, syllabus.
 {¶ 145} Dr. Pearlstein was ordered to make an equalization payment of $397,230 on or before August 15, 2008, however, the court was silent as to any tax consequences associated with such payment.
 {¶ 146} "Pursuant to R.C. 3105.171(F)(6), the trial court is required to consider the tax consequences of a property division. * * * In interpreting [R.C. 3105.171(F)(6),] the general rule is that, ordinarily, `if the award is such that, in effect, it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered.'" Rice at ¶ 31, citing Day at 159. Where, however, "an appellant has failed to produce evidence of tax consequences in the trial court * * * tax consequences are speculative and need not be considered." Id., citing Bauman v.Bauman, 6th Dist. No. E-01-025, 2002-Ohio-2172, ¶ 16. "The rationale is that without evidentiary support to show what the tax consequences would be, the court would be asked to erroneously engage in determining the tax consequences of the transaction based upon mere conjecture or speculation." Id., citing White v. White (Feb. 18, 1988), 9th Dist. No. 18275, 1998 Ohio App. LEXIS 538, 9.
 {¶ 147} In Rice, we dismissed this same argument where the appellant's objection to the magistrate's failure to consider the tax consequences of the distributive award was overruled by the trial court. Even though the appellant in that case raised the tax issue in his objections to the magistrate's decision, he failed to produce any evidence as to what the tax consequences would be. Thus, in Rice, we reviewed a similar argument from Ferrero v. Ferrero (June 8, 1999), 11th Dist. No. 98-CA-00095, 1999 Ohio App. *Page 35 
LEXIS 2848, reiterating that: "[t]he transcript shows that appellant failed to present any actual evidence on the tax issue beyond his argumentation. Under these circumstances, the trial court in this case was not obligated to consider the tax consequences because any determination on the issue would have been purely speculative. * * * Moreover, given that appellant offered no evidence on the tax issue at the trial court level, he has waived the right to assert this argument on appeal." Id. at ¶ 32, quoting Ferrero at 15-16 (citations omitted).
 {¶ 148} Furthermore, "when considering whether a trial court has abused its discretion in dividing marital property, a reviewing court `should not review discrete aspects of the property division out of context of the entire award.'" Id. at ¶ 33, quoting Baker v. Baker
(1992), 83 Ohio App.3d 700, citing Briganti v. Briganti (1984),9 Ohio St.3d 220, 222. "Instead, a reviewing court `should consider whether the trial court's disposition of marital property as a whole resulted in a property division which was an abuse of discretion.'" Id., quotingBaker at 700-701. "Thus, `a reviewing court may modify a property division only if it finds that the trial court abused its discretion by dividing the property as it did.'" Id., quoting Cherry at 355.
 {¶ 149} Dr. Pearlstein not only failed to raise the issue of the tax consequences for the property division or object to the magistrate's decision, he also failed to offer any evidence of what the tax consequences would be. In addition, he failed to object to the timing of the lump sum payment and now fails to argue on appeal what "extended time frame" would be appropriate in light of any claimed tax consequences. Thus, we find no abuse of discretion in the trial court's failure to engage in what would be a speculative conjecture. *Page 36 
 {¶ 150} Dr. Pearlstein's eighth assignment of error is without merit.
 {¶ 151} Payment of Wife's Attorney Fees
 {¶ 152} In his ninth assignment of error, Dr. Pearlstein contends that the trial court abused its discretion in its award of attorney fees. Specifically, Dr. Pearlstein argues three separate issues: (1) the court erred in awarding Ms. Pearlstein $5,000 in attorney fees to be paid by August 30, 2008, as part of her spousal support award; (2) the court erred in failing to order Ms. Pearlstein to reimburse him half of the $8,500 she unilaterally withdrew from a marital account to pay her attorney to initiate the divorce action; and (3) the court should have ordered Ms. Pearlstein to pay the attorney fees he incurred in prosecuting his motions of contempt.
 {¶ 153} "A decision regarding an award of attorney fees is left to the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." Ohlemacher at ¶ 39, citing Holcomb v.Holcomb, 9th Dist. No. 01CA007795, 2001 Ohio App. LEXIS 4328, 21, citingBowen v. Bowen (1999), 132 Ohio App.3d 616, 642. "An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable." Id., citing Blakemore at 219.
 {¶ 154} In relevant part, R.C. 3105.18(H) provides:
 {¶ 155} "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including * * * any proceeding arising from a motion to modify a prior order or decree * * * if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to *Page 37 
any party pursuant to this division, it shall determine whether eitherparty will be prevented from fully litigating that party's rights andadequately protecting that party's interests if it does not awardreasonable attorney fees." (Emphasis added.)
 {¶ 156} The record reflects that both parties paid for attorney fees from marital assets up to the time of the divorce proceeding. Further, each was given $35,000 from the Vanguard account while the divorce was pending, in part, to pay for attorney fees. There is no question that Dr. Pearlstein's income is eighteen times greater than Ms. Pearlstein's. The parties' jointly stipulated that Ms. Pearlstein's income is $25,000 and that Dr. Pearlstein's income is $461,654. The magistrate found Ms. Pearlstein initially withdrew $8,500 from the parties' joint account in the summer of 2006; her first attorney withdrew as counsel on September 28, 2007; and that Ms. Pearlstein sought an award of attorney fees.
 {¶ 157} The magistrate concluded Ms. Pearlstein should not be required to reimburse Dr. Pearlstein for half of the money she withdrew from their joint account and that except for that portion and the portions already paid, each party should pay their own attorney fees incurred. In addition to adopting the magistrate's decision, the court ordered Dr. Pearlstein to pay $5,000 for attorney fees on or before August 30, 2008, as additional spousal support.
 {¶ 158} We find no abuse of discretion in this determination. Both parties are to share equally the court costs and separately pay their remaining attorney fees. Both parties were paying their attorney fees from marital assets, and money was specifically withdrawn from the Vanguard account for both parties to pay for their attorney fees while the divorce was pending. *Page 38 
 {¶ 159} Regarding the $5,000 spousal support award for attorney fees, we are provided with no authority supporting the assertion that the court abused its discretion in making this additional spousal support award.
 {¶ 160} "In determining whether to grant spousal support and in determining the amount and duration of the payments, the trial court must consider the factors listed in R.C. 3105.18(C)(1)(a)-(n)."Cooper v. Cooper, 8th Dist. No. 86718, 2006-Ohio-4270, ¶ 8, citingBeck v. Beck (Dec. 16, 1999), 8th Dist. No. 75510, 1999 Ohio App. LEXIS 6084. "A trial court has broad discretion to examine all the evidence before it determines whether an award of spousal support is appropriate." Id., citing Holcomb v. Holcomb (1989) 44 Ohio St.3d 128,130. "A decision regarding spousal support will not be disturbed on appeal absent an abuse of that discretion." Id., citingBlakemore at 219.
 {¶ 161} The magistrate's findings of fact regarding spousal support, while not specifically referencing R.C. 3105.18 demonstrate that the court considered the factors outlined in (c)(1)(a)-(n) providing sufficient detail to enable a reviewing court to conduct a meaningful review. Kaechale v. Kaechale (1988), 35 Ohio St.3d 93, 97. The court applied the correct "appropriate and reasonable" standard. Thus, we find there was sufficient basis for this award.
 {¶ 162} Finally, Dr. Pearlstein raises the issue that he was not awarded attorney fees for prosecuting his motions to hold Ms. Pearlstein in contempt for failure to return some personal property. The magistrate, however, found that no testimony or evidence was introduced regarding the reasonableness and necessity of the fees incurred relative to the prosecution of Dr. Pearlstein's contempt motions. The only testimony at all *Page 39 
regarding attorney fees was from Dr. Pearlstein. He stated that he incurred attorney fees in the amount of $1,000 to prosecute the contempt actions. In its final order, the court found Ms. Pearlstein guilty of contempt, and fined her $500.
 {¶ 163} With no evidence presented of the fees incurred, we do not find any error in the court's failure to order Ms. Pearlstein pay Dr. Pearlstein's fees for the prosecution of the contempt motions.
 {¶ 164} Thus, we find no abuse of discretion in the court's determination of attorney fees. Furthermore, Dr. Pearlstein failed to fully brief this issue and cites to no authority to support his argument. Keating at ¶ 111.
 {¶ 165} Dr. Pearlstein's ninth assignment of error is without merit.
 {¶ 166} Return of Dr. Pearlstein's Religious Items
 {¶ 167} In his tenth assignment of error, Dr. Pearlstein contends that the trial court erred in failing to order Ms. Pearlstein to return certain religious items, which included a family heirloom and some prayer books, which he claimed were in a desk that Ms. Pearlstein took in violation of a temporary restraining order regarding the removal of any household items from the marital residence.
 {¶ 168} We find this argument wholly without merit as there was simply no evidence that Ms. Pearlstein took the religious items, and she specifically denied taking the items at trial. While Ms. Pearlstein did admit to taking the children's furniture and various other marital household goods, she adamantly denied that she took the religious items. There was no evidence to prove otherwise. Furthermore, Dr. Pearlstein fails to offer any authority in support of his argument, in addition to his failure to provide any evidence that Ms. Pearlstein has possession of those items. Keating at ¶ 111. *Page 40 
 {¶ 169} Dr. Pearlstein's tenth assignment of error is without merit.
 {¶ 170} The Children's Uncovered Medical Expenses
 {¶ 171} In his eleventh assignment of error, Dr. Pearlstein contends that the trial court abused its discretion in failing to order the parties' agreement into effect and issuing a contrary order that Dr. Pearlstein pay 100% of the children's uncovered medical expenses. We find this argument to be wholly without merit as the record before us is devoid of any stipulation, written or otherwise as to this issue.
 {¶ 172} Furthermore, Dr. Pearlstein failed to support this issue with any authority, and thus, his argument should also be dismissed on this basis. Keating at ¶ 111.
 {¶ 173} Dr. Pearlstein's eleventh assignment of error is without merit.
 {¶ 174} The "Catch-all" Assignment of Error
 {¶ 175} In his twelfth assignment of error, Dr. Pearlstein contends that based on all of the issues raised on appeal the trial court erred and abused its discretion. This blanket argument fails in that it was not fully briefed and cites to no authority in support of such a "catch-all" assignment of error. Keating at ¶ 111.
 {¶ 176} Dr. Pearlstein basically argues and outlines what he believes is a more equitable distribution of the marital property according to the issues he raised in his previous assignments of error. Thus, in this argument, he provides what he believes is a more equitable distribution by: assigning a value of $150,000 for Pearl Interior Design (for which no expert or other testimony was introduced), deducting the amounts paid for the guardian ad litem and real estate taxes for the home that was awarded to him (which were paid out of marital assets and, which was not raised as an issue at trial or in his objections to the magistrate's decision), and by valuing his interest in the medical *Page 41 
practice according to his expert's valuation (which was found to be less than credible in that it discounted for certain items and did not include "goodwill"). He then notes, perhaps to convince us that his property distribution is more equitable, that his proposed equalization payment did not even account for his $35,000 alleged separate interest in the Vanguard account or his attorney fees (which he raised as assignments of error in any case and, which we found to be wholly without merit as no evidence was introduced on either of those issues).
 {¶ 177} Thus, these issues, which as we exhaustively noted above, are without merit.
 {¶ 178} Dr. Pearlstein's twelfth assignment of error is without merit.
 {¶ 179} The judgment of the Geauga County Court of Common Pleas is affirmed.
COLLEEN MARY O'TOOLE, J., concurs,
DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.
[1] While this appeal was pending, Ms. Pearlstein filed a motion to strike portions of Dr. Pearlstein's brief that concerned Dr. Pearlstein's post-trial motion filed with the trial court contesting spousal support, and the subsequent hearing and post-trial decree. Ms. Pearlstein also filed a motion to supplement the record with an affidavit where she avers that Dr. Pearlstein has already given her the household goods he raises in his seventh cross-assignment of error, and thus this issue is moot. We find both of these issues are moot as the post-trial issues raised below after this appeal was filed are not properly before us and may not be considered; and we determined the trial court did not abuse its discretion in distributing the household goods in question.