[Cite as *Pruitt v. Pruitt*, 2022-Ohio-2058.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

ANDREA M.K. PRUITT :

      Plaintiff-Appellee           :     Appellate Case No. 29331

v. :     Trial Court Case No. 2018-DR-752

JACOB W. PRUITT :     (Appeal from Common Pleas
                                     :     Court – Domestic Relations Division)

      Defendant-Appellant      :

                                     :

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of June, 2022.

. . . . . . . . . . .

TERRY W. POSEY, Atty. Reg. No. 0039666, 51 South Main Street, Centerville, Ohio 45458
      Attorney for Plaintiff-Appellee

CHERYL R. WASHINGTON, Atty. Reg. No. 0038012, 10 West Second Street, Suite 2225, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Jacob W. Pruitt ("Jacob") appeals from a final judgment and decree of divorce issued by the Montgomery County Court of Common Pleas, Domestic Relations Division. He challenges the trial court's division of the parties' marital property and debt, its grant of custody of the couple's minor son to his former wife, Andrea M.K. Pruitt ("Andrea"), and its parenting time order. For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings consistent with the opinion.

## I. Facts and Procedural History

{¶ 2} Jacob and Andrea married in Dover, Delaware, on June 23, 2012. Both had previously been married, and each had a daughter from the prior relationship. Together they had a son, J.P., who was born in Delaware in March 2014. After Jacob separated from the military in 2016, the family moved to Dayton, Ohio, and purchased a home on Taylorsville Road. Andrea moved from the marital residence on July 2, 2018.

{¶ 3} The next month, Andrea filed a complaint for divorce; Jacob filed an answer and counterclaim for divorce. Both parties sought custody of J.P. and requested temporary child support. While their requests for a temporary custody order were pending, Andrea denied her husband access to J.P.

{¶ 4} On December 5, 2018, after a hearing, a magistrate issued a decision finding that it was J.P.'s best interest for Andrea to have parenting time from noon on Wednesdays until 6:00 p.m. on Saturdays and for Jacob to have parenting time from 6:00 p.m. on Sundays until noon on Wednesdays. The parties would "alternate Saturday and

will coordinate Saturday schedule to coincide with his/her Saturday work schedule." The decision ordered, however, that Jacob was to have J.P. from Saturdays at 6:00 p.m. to Wednesdays at noon. The magistrate declined to issue a custody order in the hopes that the absence of a custody order would prevent denial of access to the child. Based on the parties' financial information, no child support or spousal support was ordered.

{¶ 5} The trial court adopted the magistrate's decision without objection from the parties. During the pendency of the divorce, the parties conducted parenting time with the alternating Saturday/Sunday schedule mentioned in the magistrate's decision. Tr. 56-57, 254.

{¶ 6} Final hearings on the complaint and counterclaim were held on September 29, 2020, and June 8, 2021. The parties stipulated to several items: the date of the marriage; the date of separation, which would be used as the termination of marriage date; their incompatibility; their residency in the county for at least six months prior to the filing of the pleadings; Jacob would retain the marital residence on Taylorsville Road; there were no retirement benefits at issue; neither party would receive spousal support and the trial court would not retain continuing jurisdiction over that issue; Andrea would return "gun logs" (itemized lists of the family's guns) to Jacob; each party would keep their own bank accounts; and each party's income was $55,000 for purposes of calculating child support. They indicated that there was no agreement on automobiles and firearms, but all other personal property had been divided. In their pretrial statements, both parties expressed a desire for sole custody of J.P. with a standard order of visitation for the other parent.

{¶ 7} The parties testified on their own behalf. In addition, Andrea offered the testimony of her father and stepmother, and Jacob presented the testimony of a next-door neighbor, his stepfather, his girlfriend, and his step-grandfather (his stepfather's stepfather). Andrea also called the court's family investigator as a witness. The witnesses and exhibits focused on the ownership of numerous guns and automobiles, items that Andrea had taken from the Taylorsville residence during the pendency of the divorce action, the debt on Jacob's credit cards, Andrea's claiming J.P. as a dependent for tax purposes during the separation, and parenting matters.

{¶ 8} On October 7, 2021, the trial court issued a decision addressing the disputed matters, during which it detailed the parties' conflicting testimony on those issues. The court awarded custody of J.P. to Andrea and granted Jacob parenting time generally in accordance with the standard parenting time order. With respect to the credit cards, the trial court ordered Jacob to be responsible for all of the credit card debt except for $1,500 that was used to pay for appliances for Andrea. The trial court declined to make an order regarding the prior tax returns, stating that "[t]he court is not sure what remedy Jacob is asking for regarding the fact that Andrea claimed the minor child on her tax returns in 2018 and 2019[.]" Decision as amended on Oct 28, 2021. The parties were to claim J.P. as a tax dependency exemption on alternating years going forward. The trial court's decision did not address the items that Andrea took from the marital residence.

{¶ 9} Counsel for Andrea was ordered to prepare a final judgment and decree of divorce consistent with the court's decision and the parties' agreements. A final judgment and decree of divorce was issued on November 16, 2021. Jacob appeals from

the trial court's judgment, raising five assignments of error. We will address them in an order that facilitates our analysis.

## II. Property Division

{¶ 10} Jacob claims that the trial court erred in its division of marital property in three respects. In his first assignment of error, he asserts that his wife engaged in financial misconduct by taking marital property from the residence and that the trial court erred in failing to compensate him for those items. The fourth assignment of error raises that the trial court should have granted him credit for Andrea's claim of the dependent tax exemption for each year during their period of separation. The fifth assignment of error claims that the trial court erred in its allocation of marital debts, namely the debt on Jacob's credit cards.

{¶ 11} Andrea asks that we overrule Jacob's challenges to the property distribution as moot on the ground that he waived his right to appeal the division of property by voluntarily satisfying that portion of the trial court's judgment. Alternatively, Andrea disputes that any error occurred. Jacob has not filed a reply brief or otherwise responded to Andrea's mootness argument.

### A. Mootness

{¶ 12} Before addressing the merits of Jacob's first, fourth, and fifth assignments of error, we must address whether the issues are now moot.

{¶ 13} "The role of courts is to decide adversarial legal cases and to issue judgments that can be carried into effect." *Cyran v. Cyran*, 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, ¶ 9, citing *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d

371 (1970); *State v. Smith*, 2d Dist. Montgomery No. 27981, 2019-Ohio-3592, ¶ 8. Under the mootness doctrine, American courts will not decide cases where an actual legal controversy no longer exists between the parties. *Id.*, citing *In re A.G.*, 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 37. "Issues are moot when they lack practical significance and, instead, present academic or hypothetical questions." *Dibert v. Carpenter*, 2018-Ohio-1054, 98 N.E.3d 350, ¶ 30 (2d Dist.), citing *State ex rel. Ford v. Ruehlman*, 149 Ohio St.3d 34, 2016-Ohio-3529, 73 N.E.3d 396, ¶ 55.

{¶ 14} A court may consider extrinsic evidence from outside the record to determine mootness. *State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 8; *Townsend v. Antioch Univ.*, 2d Dist. Greene No. 2008-CA-103, 2009-Ohio-2552, ¶ 8.

{¶ 15} As a general rule, the voluntary satisfaction of a judgment renders an appeal from that judgment moot. *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 245, 551 N.E.2d 1249 (1990). "Where the court rendering judgment has jurisdiction of the subject-matter of the action and of the parties, and fraud has not intervened, and the judgment is voluntarily paid and satisfied, such payment puts an end to the controversy, and takes away from the defendant the right to appeal or prosecute error or even to move for vacation of judgment." *Id.*, quoting *Rauch v. Noble*, 169 Ohio St. 314, 316, 159 N.E.2d 451 (1959), quoting *Lynch v. Lakewood City School Dist. Bd. of Edn.*, 116 Ohio St. 361, 156 N.E. 188 (1927), paragraph three of the syllabus. "The reason for the general rule is that reversing a trial court judgment following full voluntary payment would not offer an appellant any relief." *Dibert* at ¶ 30, citing *Poppa Builders, Inc. v. Campbell*, 118 Ohio App.3d 251,

253, 692 N.E.2d 647 (2d Dist.1997).

{¶ 16} An appellant's satisfaction of a judgment is not considered involuntary even when it is made due to collection efforts (such as garnishment of wages), the appellant's financial circumstances, or other economic considerations. *Taylor v. Johnson*, 2d Dist. Montgomery No. 28242, 2019-Ohio-2132, ¶ 10, citing *Blodgett* and *Poppa Builders.* (Other citations omitted.) In *Blodgett*, the Ohio Supreme Court held that the wife's acceptance of the full amount of the marital award and her signing a satisfaction of judgment terminated her appeal from the judgment and decree of divorce, despite her claims that she felt compelled to accept the payments because she could not afford to wait for the outcome of the appeal.

{¶ 17} We have stated, however, that "*Blodgett* does not stand for the proposition that any payment toward the satisfaction of a judgment while an appeal is pending renders moot the appeal or any specific issue therein." *Janis v. Janis*, 2d Dist. Montgomery No. 23898, 2011-Ohio-3731, ¶ 28. In *Janis*, Mrs. Janis provided three checks to her husband while his appeal from the judgment and decree of divorce was pending. Mrs. Janis contended that two of the checks, which were cashed, represented the entire amount due to Mr. Janis related to their limited partnership called Manna. Mr. Janis also received a third check representing his share of the proceeds from the sale of a marital home; that check was not cashed. Mrs. Janis argued that Mr. Janis's acceptance of payment for the home and business assets rendered his appeal of those awards moot. We disagreed, noting that "Mrs. Janis has cited no authority for her suggestion that certain aspects of an appeal can be rendered moot by the actions of the parties without an

agreement to that effect and without payment in full." *Id.* at ¶ 28. Mrs. Janis further argued that the judgment was substantially satisfied because Mr. Janis failed to return a check that was written to him, because he retained access to the funds, although he did not deposit or cash the check. We rejected the notion that "substantial satisfaction of a judgment (rather than full satisfaction) can render an appeal moot, or that tendered payment can constitute satisfaction." *Id.* at ¶ 29.

{¶ 18} In this case, we have no evidence that Andrea accepted payment of the full amount due to her and, consequently, that the monetary aspects of the final judgment and decree of divorce have been satisfied. In support of her assertion that Jacob voluntarily satisfied the judgment, Andrea has provided a copy of correspondence from Jacob's attorney to her attorney, in which Jacob's counsel informed Andrea's counsel that her client had "given me money orders totaling $2,029.00, which represents the monies owed your client pursuant to the divorce decree. (See attached copies of the money orders.) Also my client has provided me with the titles to the vehicles your client was awarded. (Copies attached.)" Jacob's counsel asked Andrea's counsel whether he wanted his runner to pick up the items or whether she should mail them.

{¶ 19} The parties have provided no information about what happened to the money orders and titles after this correspondence. We are left to speculate how and when they were delivered to Andrea's counsel (if they were delivered at all) and whether the money orders were cashed or deposited by Andrea. The correspondence from Jacob's counsel was insufficient to establish that Jacob satisfied the judgment. Accordingly, Andrea has not established that the property division issues are moot.

**B. Standards for Division of Marital Property**

{¶ 20} "When dividing married parties' assets and liabilities upon divorce, a court must first determine what is marital property and what is not." *Bergman v. Bergman*, 2d Dist. Montgomery No. 25378, 2013-Ohio-715, ¶ 27. The trial court must classify specific property as marital or separate, and where appropriate, must distribute separate property to the owner. *Id.*, citing R.C. 3105.171(B) and (D). The trial court's classification must be supported by competent, credible evidence. *Id.*, citing *Mays v. Mays*, 2d Dist. Miami No. 2000-CA-54, 2001 WL 1219345, at *3 (Oct. 12, 2001); *Umbaugh v. Stinson*, 2d Dist. Greene No. 2019-CA-62, 2020-Ohio-3299, ¶ 8.

{¶ 21} Courts have broad discretion on how to divide marital property. *Jensen v. Jensen*, 2d Dist. Clark No. 2019-CA-29, 2019-Ohio-4703, ¶ 41; *Wright v. Cramer*, 2018-Ohio-764, 107 N.E.3d 836, ¶ 11 (2d Dist.). However, when dividing marital property and determining whether to make and the amount of any distributive award, the court must consider all of the following factors:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to

be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.171(F).

{¶ 22} Debts, like assets, are considered property. *Montgomery v. Montgomery*, 2d Dist. Greene No. 2018-CA-16, 2019-Ohio-1803, ¶ 24. Consequently, orders assigning debt to one party or another are part of the property division. *Id.*, citing *Arnett v. Arnett*, 2d Dist. Montgomery No. 20332, 2004-Ohio-5274, ¶ 8; *Kraft v. Kraft*, 2d Dist. Montgomery No. 25982, 2014-Ohio-4852, ¶ 41 ("Since the court, pursuant to R.C. 3105.171(F)(2), must consider both the parties' assets and liabilities, 'an equitable division of marital property necessarily implicates an equitable division of marital debt.' "). The party seeking to have debts classified as a separate (rather than marital) liability must show "by a preponderance of the evidence, that such debt was the separate obligation of the other spouse." *Montgomery* at ¶ 34, quoting *Brady v. Brady*, 11th Dist. Portage No. 2007-P-0059, 2008-Ohio-1657, ¶ 38.

{¶ 23} When dividing marital property, the court begins with an equal division, but it may divide the property unequally if it concludes that an equal division would be

inequitable. *Ulliman v. Ulliman*, 2d Dist. Montgomery No. 22560, 2008-Ohio-3876, ¶ 28, citing R.C. 3105.171(C)(1). We review property divisions in divorce proceedings for an abuse of discretion. *Umbaugh*, 2d Dist. Greene No. 2019-CA-62, 2020-Ohio-3299, ¶ 7. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### C. Items Removed from Marital Residence

{¶ 24} First, Jacob argues that Andrea engaged in financial misconduct by taking guns, precious metals, and other items from the marital residence and that he should have been compensated for the value of that property.

{¶ 25} It was undisputed that Andrea came back to the Taylorsville residence after the parties separated and retrieved items from the home. According to Jacob, Andrea took a television from the home in August 2015; he did not ask the court for an offset to compensate him for its value. Also taken were "most all of everything that [J.P] had in his room," including clothing and toys. Andrea also reportedly collected all "female items" not belonging to his daughter; those included items owned by Beverly Pacheco Espinosa, Jacob's girlfriend.

{¶ 26} Jacob identified several guns that Andrea allegedly took: a Smith & Wesson AR-15, valued at $2,800; a Springfield N-1A, valued at $6,000; a Governor, valued at $625, and a Ruger 10/22 belonging to Jacob's daughter, valued at $250. Jacob testified that each gun was purchased prior to marriage; none was listed in Jacob's gun book. Jacob also stated that Andrea took his son's and Andrea's daughter's guns, which were

bought during the marriage; Jacob did not want an offset for those guns.

{¶ 27} Jacob also testified about silver and gold that was taken when Andrea returned to the home a second time. One item was a 100-ounce bar of silver that belonged to him, but which they had used as collateral for a loan from his grandmother. Jacob estimated the value of the bar to be between $1,800 and $2,000. Andrea also removed "all of [J.P.s] silver" and all of Andrea's daughter's silver: "[t]hey each had a gram of gold, as well." Tr. 241. Jacob elaborated that J.P. had 20 to 25 ounces of silver valued at $400. Andrea also took an ounce of gold, which he estimated to be worth $2,000 to $2,200, and "blue silver," which he did not value. Jacob testified that he preferred to have the guns back, but was asking for compensation for the value of the items removed from the home.

{¶ 28} Andrea acknowledged that she took a television and her son's belongings in August 2018. She also admitted to taking four or five guns, silver, and possibly gold from the residence. Andrea testified that there were two bars of silver as well as some ounces of silver that were divided among the family members. She did not know how much silver she took, but she said that it "was what my children had," plus one bar. Tr. 93. She elaborated that there were two bars of silver, but she had taken one. Andrea sold the guns, silver, and gold and did not give any of the proceeds to Jacob. She denied taking any of Pacheco Espinosa's belongings.

{¶ 29} The trial court's decision did not address any of the items that Andrea took from the Taylorsville residence after she had moved out. The disputed silver and gold was not mentioned. While the decision had a section that dealt with firearms, that

section determined the disposition of the firearms listed on Defendant's Exhibit 4 and 5; the firearms taken from the home by Andrea apparently were not included on those lists.

{¶ 30} In her appellate brief, Andrea recognizes that the trial court did not resolve these disputed items, but she argues that Jacob's assignment of error nevertheless should be overruled. She argues that the evidence clearly established that Pacheco Espinosa's belongings were not marital property and, further, that Jacob's testimony regarding the firearms and precious metals was self-serving, not supported with documentary evidence, and was not "worthy of belief." In essence, Andrea asks us to find that Jacob is not entitled to compensation for any of the property that Andrea allegedly, and to a large extent, admittedly, took.

{¶ 31} Andrea's argument is unpersuasive. It is the province of the trial court to make credibility determinations, to decide which items constitute separate property, and to equitably divide marital property. We cannot, as Andrea asks, place ourselves in the role of the trial court. Nor can we conclude that the trial court acted within its discretion in failing to make an award in Jacob's favor with respect to this property. We have held, in a variety of circumstances, that it is an abuse of discretion for a trial court to fail to exercise its discretion. This is so even when the failure to exercise discretion is inadvertent, as may be the case here. *See, e.g., Bank of Am. v. Litteral*, 191 Ohio App.3d 303, 2010-Ohio-5884, 945 N.E.2d 1114, ¶ 24. On the record before us, there is no indication that the trial court actually exercised its discretion in failing to address the items taken from the marital home by Andrea during the separation. Accordingly, the matter must be remanded for the trial court to make determinations as to whether and/or in what

amount(s) Andrea took marital and separate property from the Taylorsville residence during the pendency of the divorce and to make an appropriate disposition.

{¶ 32} Jacob's first assignment of error is sustained.

**D. Tax Exemption**

{¶ 33} Jacob next asserts that the trial court failed to grant him equitable credit for Andrea's claiming J.P. as a dependent on her tax returns in 2018 and 2019.

{¶ 34} As noted by Andrea in reply, Jacob did not establish the value of the dependent tax exemption. Jacob admitted that he did not file taxes for those years, although he claimed he did not do so because he was waiting for the trial court to determine who could claim J.P. as a dependent. Regardless of Jacob's motivation for failing to file his tax returns, he did not provide the court with financial information about how claiming J.P. as a dependent would have altered his tax obligations.

{¶ 35} Where a party fails to present credible evidence of the value of the disputed property, a trial court does not abuse its discretion in failing to value or consider the property. *See Bradley v. Bradley*, 8th Dist. Cuyahoga No. 109792, 2021-Ohio-2514, ¶ 111 (no abuse of discretion where husband did not provide credible evidence of value of his assets, income, and liabilities); *Pearlstein v. Pearlstein*, 11th Dist. Geauga No. 2008-G-2837, 2009-Ohio-2191, ¶ 120 (no abuse of discretion in valuing business at $0 where no credible evidence was presented as to its value). In the absence of any evidence regarding the value of the dependent tax exemption to Jacob in 2018 and 2019, the trial court did not err in failing to consider it in making its property distribution.

{¶ 36} Jacob's fourth assignment of error is overruled.

### E. Credit Card Debt

**{¶ 37}** Third, Jacob contends that his credit cards were used to pay marital expenses and, therefore, the debt on those cards should have been equitably divided.

**{¶ 38}** The parties testified about four credits cards: two issued by USAA and two issued by Navy Federal Credit Union (NFCU). Andrea testified that she had her USAA credit card and Jacob had his. She stated that she never used Jacob's cards, explaining Jacob "always said it's his money. He does what he wants with it. I've never had any contact or control over any of his money." Tr. 43. Andrea reported that all of her money went toward house payments, bills, and groceries, and Jacob's money went toward "[w]hatever he wanted to spend it on." Tr. 102. Andrea testified that she did all of the grocery shopping and she paid for them with her pay check or child support money. During the periods when Jacob was not working, they did not use credit cards to purchase items for the family. Instead, Andrea worked extra hours (60-70 hours per week). Tr. 103. She could not think of any time when Jacob's credit card was used for household purchases. *Id.*

**{¶ 39}** In contrast, Jacob testified that he believed the four credit cards all represented marital debt. Tr. 242. According to Jacob's testimony, the balances on the two USAA credit cards, as of the date of separation, were approximately $11,000 and $15,000. Printed statements for those two cards showed balances of $14,484.77 (due June 23, 2020) and $15,872.79 (due October 11, 2020), respectively. Def.'s Ex. K-1 & K-2. The USAA card with approximately $14,000 due previously had been paid off before the family moved back to Ohio using $10,000 from Jacob's grandmother. Tr. 245.

The second USAA card was obtained after the family relocated to Ohio. Jacob testified that both cards were used to pay bills, because the couple was not making quite enough to cover all of their expenses. He elaborated that their cash went toward their house payment, and their groceries, utilities, internet, gas, and the like were charged to the credit cards. Tr. 246. Jacob stated that Andrea used the cards for grocery shopping and she was aware that he was using the cards for household items and goods.

{¶ 40} Jacob indicated that the two Navy Federal Credit Union cards also were obtained during the marriage, one before the move back to Ohio and the second in 2017. The cards originally were intended to be used for balance transfers from the USAA cards, because NFCU balance transfers did not accrue interest for a year. Both cards were in Jacob's name only, but Andrea was aware Jacob was using the cards. He stated that Andrea also used both cards for groceries and to pay bills. Jacob offered statements for the two NFCU cards from September 2018, both of which had balances of roughly $12,000. Def.'s Ex. L-1 & L-2. He testified that, on the date of separation, one card had a balance closer to $10,000 and the other was closer to $15,000. Tr. 249.

{¶ 41} Jacob testified that he used credit cards to purchase a refrigerator, stove, and washer and dryer for Andrea when she moved out, at an approximate cost of $1,500. Andrea agreed that Jacob bought her appliances, although she testified that he had used their income tax money. Tr. 86.

{¶ 42} Jacob testified that all four cards have gone to collection and are no longer open. Tr. 248. None of the offered credit card statements showed purchases made.

{¶ 43} In allocating all of the credit card debt (minus $1,500 for the refrigerator,

stove, and washer and dryer) to Jacob, the trial found that Andrea's testimony was credible. It specifically found that "Andrea was unaware of the credit cards and that Jacob has failed to demonstrate that the balances on the credit cards were for marital purchases."

{¶ 44} On this record, we cannot conclude that the trial court abused its discretion in ordering Jacob to be responsible for the credit cards in his name, with the exception of the $1,500 for Andrea's appliances. Although debts incurred during the marriage are presumed to be marital, the presumption is rebuttable. In this case, Andrea testified that she paid all of the household expenses, such as housing, groceries, and other bills, and that Jacob used his credit cards for his own purposes and not for household expenses. Jacob disputed Andrea's assertion, but he did not offer any documentary evidence to support his claim that the credit cards were used for marital purposes. Faced simply with conflicting testimony, the trial court credited Andrea's version of events. We will not second-guess its credibility determination. The division of the parties' debt was supported by the evidence, and the trial court did not act unreasonably in allocating the credit card debt to Jacob exclusively.

{¶ 45} Jacob's fifth assignment of error is overruled.

### III. Child Custody

{¶ 46} In his third assignment of error, Jacob contends that the trial court's decision to name Andrea as the residential and custodial parent was against the manifest weight of the evidence.

{¶ 47} Upon satisfactory proof of the causes of divorce, the trial court must "make

an order for the disposition, care, and maintenance of the children of the marriage, as is in their best interests, and in accordance with [R.C. 3109.04.]"  R.C. 3105.21(A); *see also* R.C. 3109.04(A).  "The court has two choices in this regard – either ordering shared parenting or giving residential and legal custody to one parent."  *Sivertsen-Kuhn v. Kuhn*, 2d Dist. Greene No. 2019-CA-17, 2019-Ohio-3525, ¶ 9.  However, if neither parent files a pleading or motion in accordance with R.C. 3109.04(G) requesting the court to grant both parents shared parental rights and responsibilities for care of the children, the court "shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children."  R.C. 3109.04(A)(1); *Bowling v. Bowling*, 2d Dist. Greene No. 2014-CA-53, 2015-Ohio-2780, ¶ 9.

{¶ 48} In this case, Jacob expressed a preference for shared parenting and continuation of equal parenting time at the final hearings; Andrea testified that she did not want shared parenting.   Neither had requested shared parenting in their pleadings or any pretrial motion, nor was a shared parenting plan submitted to the court.   Under these circumstances, the trial court was required to allocate residential and legal custody of J.P. primarily to one parent.

{¶ 49} When allocating parental rights and responsibilities, the trial court must consider all relevant factors in determining the best interest of a child, including, but not

limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) * * * [W]hether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; * * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's

right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1); *see also Portis-Phillips v. Phillips*, 2d Dist. Clark No. 2016-CA-34, 2016-Ohio-7803, ¶ 19.

**{¶ 50}** The trial court is not required to discuss the factors in R.C. 3109.04 individually when making its best-interest determination. *See Palichat v. Palichat*, 2019-Ohio-1379, 135 N.E.3d 389, ¶ 28 (2d Dist.). Rather, "[t]he critical issue is whether the record supports the trial court's conclusions and whether it explained its best-interest determination sufficiently. *Id.*, citing *Hutchinson v. Hutchinson*, 2d Dist. Montgomery No. 26221, 2014-Ohio-4604, ¶ 33-36.

**{¶ 51}** A trial court enjoys broad discretion when determining the appropriate allocation of parental rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988); *Montei v. Montei*, 2d Dist. Clark No. 2013 CA 24, 2013-Ohio-5343, ¶ 28. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Id.* Absent an abuse of that discretion, a reviewing court will affirm the trial court's custody determination. *Id.*; *Montei* at ¶ 28.

**{¶ 52}** The trial court heard extensive testimony regarding the statutory factors relevant to the custody determination. Both parties testified and presented additional witnesses and exhibits on their behalf. Cris Olmstead, the court's family investigator,

also testified, and her report was offered into evidence.

{¶ 53} According to the evidence at the hearings, Andrea is a licensed practical nurse (LPN), who passed the NCLEX exam in February 2020. She was employed at the time of the hearings at Bethany Lutheran Village in Kettering, Ohio. Andrea had entered the United States Coast Guard after high school and received a general discharge because they did not believe she was suited for the military. She was married for two years after leaving the Coast Guard and had custody of her daughter, Dixie, from that relationship. In June 2021, Dixie was 10 years old. Andrea stated that she has a good relationship with her former husband and his wife, who live in Virginia.

{¶ 54} Jacob was in the military when he and Andrea married. From approximately July 2014 to January 2015, Jacob was deployed to Qatar, and Andrea took care of their three children. Jacob separated from the military in 2016, and the family moved to Ohio. Jacob had periods of unemployment, and he worked for a time at a gun shop, the postal service, and Wal-Mart. At the time of the June 2021 hearing, Jacob had been employed as a peace officer at Wright Patterson Air Force Base for two years. Jacob met Pacheco Espinosa at Wal-Mart in November 2017, and they had been in a committed relationship throughout the parties' separation. Jacob had custody of his daughter from his first marriage; in June 2021, she was 13 years old.

{¶ 55} At the time of the June 8, 2021 hearing, J.P. was seven years old and had finished first grade. He and his sister, Dixie (Andrea's daughter), had a good relationship, and Andrea testified that her daughter and Jacob's daughter played together. Susan Fennell, Andrea's stepmother, testified that Jacob's daughter considered Andrea

to be her mother and Andrea had thrown birthday parties for all the children. Jacob testified, however, that Andrea and his daughter had not had a good relationship since before the separation.

{¶ 56} Andrea testified that she was the primary caregiver for the children, and she took them to doctor and dentist appointments. Andrea's father and stepmother described Andrea as a very caring mother who wanted the best for her children. Susan Fennell further stated that the children were well-behaved with Andrea. However, Dodd Radar, Jacob's stepfather, testified that J.P. was "wild" with Andrea and that Andrea was not a "great parent." Vaugh, Jacob's step-grandfather, similarly stated that the children did not obey Andrea as much as they should. Vaugh and Radar both testified that J.P. behaved around Jacob.

{¶ 57} Susan Fennell stated that she had seen Jacob with J.P. and Jacob treated him "rough." Susan had seen Jacob hit all of the children in the back of the head, thinking it was funny. She described his behavior as "mean rough," not "playful rough." In contrast, several witness – Robert Seibert, Jacob's next-door neighbor; Vaugh; Radar; and Pacheco Espinosa – testified that they had seen Jacob and J.P. playing football, playing board games, working on cars, and watching television together. Seibert never saw Jacob be mean to J.P. Radar also testified that Jacob engaged in horseplay with J.P., not mean behavior, and Pacheco Espinosa said that J.P. followed Jacob around and was not afraid of him.

{¶ 58} Andrea described an incident when Jacob shot Dixie with an airsoft gun because she reportedly had not been getting ready for school fast enough. Children

services was contacted about the incident, and after Jacob threatened Dixie, the family agreed to lie to the investigator, saying that they had been playing a game. Andrea testified that she had had multiple conversations with Jacob about his shooting airsoft guns at the children.

{¶ 59} Andrea took items from the marital residence after the parties separated. Jacob was not there, but Pacheco Espinosa was at the home when Andrea arrived. Pacheco Espinosa testified that, when Andrea saw her, Andrea started insulting her, calling her names, and acted aggressively. When Andrea called the police, John Pruitt came and took Pacheco Espinosa to his house. Pacheco Espinosa listed her belongings that Andrea had taken from the Taylorsville house.

{¶ 60} Andrea had a three-bedroom home with a yard, and J.P. walked to school. He had friends from school and played with people he knew at the playground. Jacob lived on a busier road, but he had five acres. Seibert testified that J.P. came over to his home and swam with his grandchildren. He described J.P. as polite and well-behaved. Seibert stated that there were a couple of other neighbors with children around J.P.'s age.

{¶ 61} J.P. had attended preschool and was in elementary school when the final hearings occurred. J.P. had an individualized education plan (IEP) due to a speech impairment, and he received speech therapy through the school. During the Covid-19 pandemic, J.P. received homeschooling (remote learning). Andrea stated that she had frequent communication with J.P.'s teachers and worked with him on his schoolwork. J.P. was behind and needed additional help. According to Andrea, Jacob had minimal contact with J.P.'s teachers and had never been to speech meetings. Jacob testified,

however, that he had participated in parent-teacher conferences.

{¶ 62} Andrea testified that when J.P. is with her, she works with him and he does well. Andrea expressed concern about the assistance J.P. receives at Jacob's house. She stated that it appeared that Jacob's daughter was doing some of J.P.'s schoolwork and, on Wednesdays when she gets J.P., Andrea finds that J.P.'s work either is not done at all or is done incorrectly because he does not have adequate help.

{¶ 63} Jacob denied that he or his daughter was doing J.P.'s schoolwork for him, although both helped him with his schooling. Radar confirmed that he had seen Jacob helping J.P. with his school work, and Pacheco Espinosa also assisted J.P. with his schoolwork. Pacheco Espinosa indicated that J.P. could not read or write and expressed the opinion that it would be best for J.P. to be in school with teachers, not switching back and forth between people with different styles and no teaching experience.

{¶ 64} Andrea had made many unilateral decisions about J.P. Jacob expressed his disagreement with Andrea's decisions to remove J.P. from preschool and later from school. Jacob said Andrea had removed J.P. from preschool in reaction to a children services complaint that she had kicked J.P. in the buttocks and called him a name. Andrea stated that when she tried to have a conversation with Jacob about what was best for J.P., Jacob took a contrary position. Andrea expressed that she would like to make all of the major decisions regarding J.P.

{¶ 65} Andrea testified that J.P. gets upset whenever he has to go to Jacob's house. When he returns, he has trouble sleeping through the night and comes to Andrea. Jacob testified that Andrea got J.P. worked up with the exchanges, but J.P.

settled down by the time they were a block or so away. At some point, Andrea unilaterally changed the drop-off location from Hardee's to the police station. The parties provided different versions as to what occurred during the exchange preceding the change.

{¶ 66} Andrea testified that she took antidepressant medications for approximately four weeks after Jacob returned from his deployment. She was not taking any medications at the time of the hearing. Jacob was taking an antidepressant and medication for anxiety. He stated that his depression and anxiety did not affect his ability to work or parent his children.

{¶ 67} Andrea testified that she would foster a relationship between Jacob and J.P., saying "I've never stopped it." She indicated that Jacob knew that he could call J.P. every night at 6:00 p.m., but he never did. Andrea admitted that she had kept J.P. from Jacob for six months because she had been afraid that Jacob would not give J.P. back to her; she also did not provide Jacob her phone number. Andrea indicated that she had allowed Jacob's family to see J.P. and she had allowed Jacob to see J.P. once the court issued a custody order. Andrea stated that she would not deny Jacob access again. Jacob said that Andrea had rarely been flexible with him regarding parenting time, and there had been times when she had been late dropping him off.

{¶ 68} Jacob worked Wednesday through Saturday from 4:30 a.m. to 2:30 p.m., but he was normally home by 1:00 p.m. Andrea worked full-time but arranged her work schedule so that she was not working when she had J.P.

{¶ 69} Andrea testified that she planned to move out-of-state as a long-term goal.

She hoped to move in approximately three years but wanted to become a registered nurse (RN) first. Jacob testified that she took J.P. out-of-state for spring break, contrary to court order.

{¶ 70} Several witnesses testified regarding the number of guns in the Taylorsville home and how they were secured. Jacob told the family investigator, Olmstead, that he had over 100 guns, many of which he had inherited from his grandfather. Jacob's gun log with receipts listed 24 guns, and his gun log without receipts listed 49 guns. Sean Fennell stated that guns were "everywhere" in the home: a gun was at the front door in a holster, a loaded revolver was on top of the refrigerator, and semi-automatic weapons were in the bedroom. Susan Fennell had also seen guns lying around the Taylorsville home, including one in a holster by the front door and another on the refrigerator. Radar testified that Jacob had two large gun safes in the basement, and most of the guns were stored there, as well as ammunition. Radar had seen about four guns not in a gun safe. Pacheco Espinosa further indicated that there were guns in the house, but she had no concerns about where the guns were. Jacob testified that all of the guns were in a gun safe at the time of the hearing and that he had taught the children about firearm safety.

{¶ 71} Andrea testified that she had thought the guns were dangerous for the children, but she had not been brave enough to leave. She had seen Jacob handle guns recklessly, and he had shot guns outside of the home's back door and windows. Andrea described an incident where Jacob had twirled a revolver on his finger and it fired close to Dixie. In contrast, Seibert testified that Jacob had a gun range and was cautious when he was shooting. Jacob testified that Andrea had never expressed any concern about

the guns when they were together.

{¶ 72} Andrea expressed concern that Jacob drank two to three bottles of whiskey per week, whereas she drank alcohol occasionally. Jacob agreed that he drank excessively between 2015 and 2018, but stated that, since the separation, he has reduced his drinking and drank socially. Pacheco Espinosa last saw Jacob drink one glass.

{¶ 73} In May 2019, Olmstead interviewed Andrea, Jacob, and Pacheco Espinosa and conducted paternal and maternal family sessions, which involved meeting with each parent and that parents' children as a group. Pacheco Espinosa participated in a portion of Jacob's family session. Olmstead also conducted home investigations.

{¶ 74} Olmstead completed her 18-page report on June 10, 2019. At that time, she recommended shared parenting with Andrea's residence designated for school purposes or, alternatively, that Andrea be named the residential and custodial parent. Olmstead suggested keeping the parenting time schedule that the court had imposed during the pendency of the case and provided additional recommendations regarding mental health treatment (Jacob maintain compliance with his treatment and Andrea obtain a mental health assessment), refraining from the consumption of alcohol and drugs while with J.P., not using corporal punishment, securing the firearms, and not making derogatory comments about the other parent, significant others, and other family members.

{¶ 75} At the final hearings, Andrea expressed a desire for sole custody of J.P. Jacob wanted a shared parenting arrangement with him as the residential parent. He

wanted to maintain a similar parenting time with J.P. as their temporary arrangement, although modified to allow for a fuller day together on the weekend day. The trial court interviewed J.P. on June 28, 2021, approximately three weeks after the second hearing. The court's decision did not disclose J.P.'s wishes and concerns.

{¶ 76} In its October 7, 2021 ruling (as modified on October 14 and 28, 2021), the trial court designated Andrea as J.P.'s residential parent and legal custodian. It found that Andrea had been the children's primary caretaker prior to the divorce and that Andrea had "been the parent who has been much more involved in [J.P.'s] education and given that [he] has some special needs, it is beneficial that Andrea continue in this role." The court expressed concern that Jacob kept loaded guns in the house when J.P. was present and about Jacob's alcohol consumption. The trial court noted that Andrea had denied parenting time to Jacob in the past. It admonished her for this behavior and advised her that Jacob must be provided all of his parenting time and that she must be flexible in providing parenting time.

{¶ 77} On appeal, Jacob argues that the trial court "lost its way" in awarding custody of J.P. to Andrea. He describes Andrea as a permissive parent who has demonstrated an inability to control J.P.'s behavior. Jacob states that Andrea has engaged in excessively turbulent, volatile behavior in public and in private, including when she withdrew J.P. from preschool. He notes that Andrea did not follow Olmstead's recommendation that she receive a mental health assessment. Jacob emphasizes that Andrea withheld parenting time for approximately six months, made unilateral decisions regarding J.P., removed items from the marital home, has refused to communicate with

him, and has expressed a long-term goal of relocating out-of-state. He further argues, in contrast, that he engages in activities with J.P. and disciplines him appropriately, that J.P. has friends in his neighborhood, and that he is more likely to honor and facilitate visitation. Jacob stated that his six-month deployment should not have affected the custody determination.

{¶ 78} The trial court was presented with substantial testimony about the issues that Jacob raises. Both parties are bonded to J.P., and J.P. appears to have loving relationships with his parents, siblings, and extended relatives. J.P. has friends near both parents' homes. Both parents engage in appropriate activities with him. Although Jacob's disciplinary style is more strict than Andrea's, the trial court could have reasonably concluded that Andrea was not overly permissive. Jacob points out that Andrea engaged in volatile behavior, but the trial court heard evidence that Jacob also engaged in inappropriate behavior at times. Jacob contends that the trial court ignored the fact that Andrea refused to communicate with him, but Andrea similarly testified that Jacob would not communicate meaningfully with her and would take contrary positions as a matter of course.

{¶ 79} Andrea did not obtain a mental health assessment, but Olmstead indicated that she merely provided recommendations to the court. Nevertheless, the court heard testimony that Andrea had previously taken an antidepressant and that Jacob was then receiving treatment for depression and anxiety. Jacob discussed the medications he was taking, and the court also had extensive medical records for Jacob from the Department of Veterans Affairs to review.

{¶ 80} The trial court's decision reflects that the court found most significant the facts that Andrea was the children's primary caregiver prior to the divorce, J.P.'s academic needs, the presence of guns in Jacob's home, and his alcohol consumption. Jacob was deployed for six months while the parties still lived in Delaware, and there was no suggestion that his deployment significantly affected the court's determination. Notably, the court found that Andrea was much more involved in J.P.'s education, and the parties agreed that J.P. was behind academically and needed additional educational support, as well as speech therapy for his speech impediment. The trial court reasonably concluded that it would be beneficial to J.P. for Andrea to continue providing educational support as the residential and custodial parent.

{¶ 81} The court expressed concern that Jacob kept loaded guns in the home. That concern was not unreasonable, particularly given the court's skepticism that Jacob was able to moderate his excessive drinking without outside assistance.

{¶ 82} Andrea acknowledged that she had denied Jacob access to J.P. prior to the issuance of a parenting schedule and that she intended to move out-of-state in a few years. The court gave due consideration to the fact that Andrea had previously denied Jacob parenting time, admonished her for this behavior, and advised her that Jacob must get all the parenting time that he was accorded and that she must be flexible in providing parenting time. While Jacob apparently believes that the trial court should have given Andrea's actions more weight, we cannot conclude that the trial court abused its discretion in failing to weigh that fact more heavily in Jacob's favor. Although not without some issues, the parties have successfully provided each other with their scheduled

parenting time since the court issued a parenting time order.

{¶ 83} Based upon our review of the record, we conclude that the trial court did not abuse its discretion in designating Andrea as the residential and custodial parent. The third assignment of error is overruled.

### IV. Parenting Time

{¶ 84} In his second assignment of error, Jacob claims that the trial court lost its way in decreasing his parenting time. In essence, he contends that the trial court should have continued the week-to-week schedule that was in effect while the divorce case was pending.

{¶ 85} R.C. 3109.051 governs parenting time of non-residential parents. *See Schwenn v. Schwenn*, 2d Dist. Greene No. 2017-CA-48, 2018-Ohio-2755, ¶ 12. In divorce proceedings involving a child where shared parenting is not ordered, the statute requires the trial court to make "a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs * * *." R.C. 3109.051(A). R.C. 3109.051(D) directs the trial court to consider 15 specific statutory factors, plus any other factor in the child's best interest, in determining whether to grant parenting time, in establishing a specific parenting time schedule, and in determining other parenting time matters. These factors include the child's relationships with parents and siblings; the geographical locations of the parents' residences; the child's and parents' available time; the child's age; the child's adjustment to home, school, and community; the health and safety of the child; the amount of time the child will spend with siblings; and the mental

and physical health of all concerned.   *Shoenfelt v. Shoenfelt*, 2d Dist. Montgomery No. 23497, 2009-Ohio-6594, ¶ 8.

**{¶ 86}** Parenting time is a matter entrusted to the discretion of the trial court. *Schwenn* at ¶ 14.   Accordingly, we review the trial court's parenting time decision for an abuse of that discretion.   *Id.*

**{¶ 87}** During the pendency of the divorce, the parties had equal parenting time. Jacob had J.P. from either Saturday or Sunday at 6:00 p.m. (alternating weeks) until noon on Wednesdays, and Andrea had him from noon on Wednesdays until 6:00 p.m. on either Saturday or Sunday.   Jacob asked the trial court to modify the parenting schedule so that he could pick up J.P. earlier in the day on Saturday/Sunday and drop him off on Wednesdays after school.

**{¶ 88}** Andrea did not like the temporary visitation schedule, stating that "[w]e never get a full weekend."   Tr. 57.   Andrea also emphasized that J.P. was behind academically and "needs consistency."   She explained that his experiences with her and with Jacob were too different, and that splitting the school week and bouncing back and forth between houses was too much for him.   Andrea also stated that J.P. complains that he is never home long before he leaves again.   Andrea specifically testified that she did not want shared parenting, that she did not think it was right for J.P., and that he needed consistency.

**{¶ 89}** The trial court ordered that Jacob have parenting time every other weekend from Saturday at 6:00 p.m. until Tuesday at 6:00 p.m.   All other parenting time was to be consistent with the court's standard order of parenting time.   We note that the standard

order of parenting time provides for summer parenting time in alternating one week increments during summer vacation.

{¶ 90} Given the trial court's findings regarding parental rights and responsibilities, we find no abuse of the discretion in the trial court's parenting time order. The trial court expressed that Andrea was more involved in J.P.'s education and that it was beneficial for Andrea to continue in that role, particularly given J.P.'s special needs. Andrea had emphasized during her testimony the need for consistency during the school week and for J.P. not to have to transition between households as frequently. The trial court's order accomplished those objectives.

{¶ 91} Jacob's second assignment of error is overruled.

## V. Conclusion

{¶ 92} The trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings consistent with the opinion.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.


Copies sent to:

Terry W. Posey
Cheryl R. Washington
Hon. Timothy D. Wood