[Cite as *State v. Slouffman*, 2023-Ohio-4055.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 21 CRB 01117 |
| | : | |
| VIRGINIA R. SLOUFFMAN | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 9, 2023

. . . . . . . . . . .

THOMAS R. SCHIFF, Attorney for Appellant

SAMUEL J. KIRK, III, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Virginia R. Slouffman was convicted after a bench trial in the Xenia Municipal Court of dereliction of duty, a second-degree misdemeanor. The trial court's sentence included restitution to the Bellbrook-Sugarcreek School District in the amount of $502 and

court costs. On appeal, Slouffman claims that her conviction was based on insufficient evidence and was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} Slouffman became a member of the Board of Education for Bellbrook-Sugarcreek Local School District in 2018. Between January and May 2019, the other Board members included David Carpenter, Kathy Kingston, Mary Frantz, and Elizabeth Betz; Betz was the Board's president and Carpenter was the Board's vice president. Except for Carpenter, who had joined the Board a couple of years before her, Slouffman's relationship with the other Board members was "not good." Slouffman testified that they "just made decisions by themselves."

{¶ 3} A tax levy benefiting Bellbrook-Sugarcreek Local School District was on the Greene County special election ballot on May 7, 2019. Citizens for Bellbrook-Sugarcreek Schools, a political action committee (PAC), was active in the months leading up to the May 7, 2019 special election and supported the passage of the levy. During that time, Douglas Cozad, the superintendent of the school district, helped organize the activities of the PAC and sent emails and PAC meeting agendas discussing PAC business to members and volunteers of the PAC, including school employees and officials.

{¶ 4} Slouffman testified that she had minimal involvement with the PAC. She did not receive Cozad's PAC-related communications, and she attended only one meeting. Slouffman made no financial contribution to the PAC. According to Slouffman, the PAC

did not provide any direction to the Board.

{¶ 5} An ongoing area of concern was a group of citizens opposed to the passage of the levy. On February 7, 2019, Slouffman texted Cozad and the other Board members that some community members "are questioning the need for the levy, the already high taxes, and urging others not to vote for it. Confusion from one of the news agencies that identified the levee [sic] as a new tax rather than a replacement." State's Ex. 10. On March 20, 2019, Cozad issued a media release about the school district's fiscal responsibility.

{¶ 6} On April 19, 2019, Kingston texted the other Board members, saying that Cozad and Betz thought that the Board should write a letter to the community explaining why it decided to put the levy on the ballot. State's Ex. 15. Carpenter provided input on what could be included in the letter. State's Ex. 17. Slouffman did not reply to Kingston's text or Carpenter's email response. She testified, "There was no need to respond. He [Carpenter] did a good job." Trial Tr. 171-172.

{¶ 7} Ultimately, in late April or early May, the Board sent two postcards, both double-sided. One postcard, invoiced as the "Board postcard," said, "Continue the Excellence with the passage of Issue 4!" It included a photograph of the five Board members and provided a web address for levy information. The back of the postcard had a lengthy statement with information about the school district's performance and funding, signed by the five Board members. State's Ex. 20.

{¶ 8} The second postcard, invoiced as the "District postcard," wrote in large letters "Issue #4 Important!" along with five bullet-point statements regarding the school district's

"A" rating and budget information, as well as the voting hours. On the back, the postcard said, "Issue #4 is critical to maintain our excellent schools, programs, and fund day-to-day operations!" It also provided seven supporting statements:

- Sustain Operating Budget
- Avoid Additional Cutbacks
- Fund Exceptional Curriculum
- Continue the Investment in our Kids
- Provide Enhanced Technology
- Keep & Attract Quality Teachers
- Maintain Academic Excellence

State's Ex. 20. (Similar language was used by the PAC in its promotional materials. *See* State's Ex. 9.) Both postcards indicated that they were paid for by Bellbrook-Sugarcreek Schools. The costs for the postcards were $3,206.26 (District) and $2,008.11 (Board), which was billed to Bellbrook-Sugarcreek Schools, care of the school district's treasurer. State's Ex. 21. The invoice was paid by the treasurer via a check dated May 14, 2019, per the authorization of the Board or the superintendent. *Id.*

{¶ 9} On November 4, 2021, Slouffman was charged by complaint with two offenses: (1) illegal transaction of public funds, in violation of R.C. 9.03(D) and R.C. 3599.40, a first-degree misdemeanor, and (2) dereliction of duty, in violation of R.C. 9.03(C) and R.C. 2921.44(E), a second-degree misdemeanor. The first charge alleged that she had knowingly used public funds to benefit a PAC by way of "payment for a mailer containing post cards promoting an operating levy." The second charge specified that Slouffman had "use[d] public funds to publish, distribute, or otherwise communicate information that supports the passage of a levy." Cozad and other Board members were also charged under separate case numbers.

{¶ 10} Slouffman and Carpenter were jointly tried at a bench trial held in December 2022. At trial, the State presented stipulated facts (State's Ex. 29) and 28 incorporated exhibits. Carpenter and Slouffman each testified on their own behalf. During her testimony, Slouffman stated that the school district did not authorize the use of public funds to support the PAC and did not provide funds to support it. She further testified that while she had known of the plans for a letter to be sent to the community from the Board, she did not provide any input and did not see the Board postcard until she received it in the mail. She expressed that the photo on the Board postcard was "horrible" and that she was upset that her name had been used without her being asked or having seen the postcard beforehand. She stated that she was unaware that a second postcard would be sent until she received it. Slouffman further testified that she did not see the invoice for the postcards until discovery in this case and that the Board did not authorize it. She acknowledged, however, that Cozad and the district's treasurer had authority to pay these types of invoices.

{¶ 11} At the conclusion of the trial, the court granted Slouffman's Crim.R. 29 motion on the illegal transaction of public funds charge but found her guilty of dereliction of duty.

{¶ 12} The court proceeded immediately to sentencing. Defense counsel asked that the trial court only require Slouffman to pay for a quarter of the cost of the Board postcard. He further asked that, upon payment, "any other sentence or any other imposition of sentence be terminated," which would allow Slouffman to ask for the sealing of the record in a year. Counsel indicated that Slouffman would make payment that day.

The State responded that it was fine with defense counsel's suggestion. After hearing from Slouffman, the court ordered her to pay restitution of $502; no jail term or fine was imposed. The trial court's judgment entry imposed the stated restitution and court costs.

{¶ 13} Slouffman appeals from her conviction, claiming that her conviction was based on insufficient evidence and against the manifest weight of the evidence.

## II. Mootness

{¶ 14} Before addressing Slouffman's arguments, we must consider whether her appeal is moot.

{¶ 15} "The role of courts is to decide adversarial legal cases and to issue judgments that can be carried into effect." *Cyran v. Cyran*, 152 Ohio St.3d 484, 2018-Ohio-24, 97 N.E.3d 487, ¶ 9, citing *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970); *State v. Smith*, 2d Dist. Montgomery No. 27981, 2019-Ohio-3592, ¶ 8. "Issues are moot when they lack practical significance and, instead, present academic or hypothetical questions." *Dibert v. Carpenter*, 2018-Ohio-1054, 98 N.E.3d 350, ¶ 30 (2d Dist.), citing *State ex rel. Ford v. Ruehlman*, 149 Ohio St.3d 34, 2016-Ohio-3529, 73 N.E.3d 396, ¶ 55. Appellate courts lack jurisdiction to consider the merits of a moot appeal. *See State v. Berndt*, 29 Ohio St.3d 3, 4, 504 N.E.2d 712 (1987); *Smith* at ¶ 9.

{¶ 16} Appeals of misdemeanor convictions are considered moot if the defendant has voluntarily satisfied his or her sentence, unless the defendant has offered evidence from which an inference can be drawn that he or she will suffer some collateral legal disability or loss of civil rights stemming from that conviction. *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236, syllabus; *Urbana v. Boystel*, 2d Dist. Champaign No. 2021-

CA-5, 2021-Ohio-2529, ¶ 9. A defendant can show that he or she did not serve a sentence voluntarily if the defendant sought a stay of the sentence to allow for the appeal. *Smith* at ¶ 10, citing *Cleveland Hts. v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, 953 N.E.2d 278, ¶ 23. A sentence is also considered involuntarily served when it is entirely served prior to conviction. *Id*., citing *State v. Benson*, 29 Ohio App.3d 109, 110, 504 N.E.2d 77 (10th Dist.1986).

{¶ 17} "A collateral disability is an adverse legal consequence of a conviction or judgment that survives despite the court's sentence having been satisfied or served." *In re S.J.K.*, 114 Ohio St.3d 23, 2007-Ohio-2621, 867 N.E.2d 408, ¶ 10. "[A] purely hypothetical statement about what might occur in the future is not sufficient to give viability to an otherwise moot appeal." *State v. Moore*, 2d Dist. Montgomery No. 20772, 2005-Ohio-4518, ¶ 14, quoting *State v. Johnson*, 43 Ohio App.3d 1, 3, 538 N.E.2d 1082 (1st Dist.1988); *Washington* at ¶ 10.

{¶ 18} "A court may consider extrinsic evidence from outside the record to determine mootness." *Pruitt v. Pruitt*, 2d Dist. Montgomery No. 29331, 2022-Ohio-2058, ¶ 14, citing, *e.g., State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 8.

{¶ 19} At sentencing, defense counsel asked the trial court to impose restitution of $502 (a quarter of the cost of the Board postcard) with any other imposed sanction terminating upon payment. Counsel told the court that such a sentence would allow him to ask for the sealing of the record a year from then. Defense counsel indicated that restitution would be paid that day. The trial court imposed $502 in restitution, as

requested, plus court costs. According to the Xenia Municipal Court's online docket, of which we take judicial notice, Slouffman owed a total of $560 in court costs as of December 15, 2022; all court costs have been paid. The online docket does not show, however, that restitution was owed or whether it was paid.

{¶ 20} Given defense counsel's statements to the trial court at sentencing and the fact that the clerk's online docket showed no balance due, we issued an order requiring Slouffman to show cause why her appeal should not be dismissed as moot. Slouffman responded to the order, noting that she was sentenced to $502 in restitution, $0 in fines, and no jail time. She further stated: "Upon the advice of counsel, and in order to avoid any issue of mootness in the Court of Appeals, Appellant has paid neither the fines nor costs per the Court's sentence." Slouffman did not assert that her conviction resulted in a collateral disability.[1]

{¶ 21} We find Slouffman's response to be somewhat confusing. Court costs are distinguishable from financial sanctions, such as fines and restitution, which are in turn distinguishable from each other. Court costs are imposed pursuant to R.C. 2947.23. In misdemeanor cases, restitution and fines are governed by R.C. 2929.28(A)(1) and (2), respectively. Slouffman acknowledged that restitution was imposed, but she stated that she has not paid the imposed "fines" (which were not actually imposed) and "costs." It is not clear what she is saying she has not paid; Slouffman did not address the payment

---

[1] Slouffman and Carpenter shared the same trial attorney, who is also representing them both on appeal. Counsel made the same argument on Carpenter's behalf at sentencing; Carpenter received the same sentence as Slouffman. As with Slouffman, the online docket for Carpenter's case also shows court costs paid in full with no mention of restitution. Consequently, we issued a similar show cause order in Carpenter's appellate case and received an identical response.

information contained on the online docket.

**{¶ 22}** We infer that Slouffman has not paid the ordered restitution, which is part of her sentence. The online docket makes no mention of the ordered restitution, and Slouffman appears to deny making any required payment. Even assuming that court costs also (or instead) are outstanding, we have held that "[u]npaid court costs alone are sufficient to prevent a judgment from being moot, even if an appellant has completed his jail sentence." *State v. Ruley*, 2d Dist. Miami No. 2017-CA-10, 2018-Ohio-3201, ¶ 10; *see also, e.g.*, *State v. Holley*, 2d Dist. Greene No. 2019-CA-44, 2020-Ohio-5104, ¶ 16. With the information before us, we must conclude that this appeal is not moot.

### III. Sufficiency and Manifest Weight of the Evidence

**{¶ 23}** On appeal, Slouffman claims that her conviction for dereliction of duty was based on insufficient evidence and was against the manifest weight of the evidence.

**{¶ 24}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 25}** In contrast, "[a] weight of the evidence argument challenges the believability

of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.   When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact.   Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin* at 175.

**{¶ 26}** Slouffman was convicted of dereliction of duty, in violation of R.C. 9.03(C) and R.C. 2921.44(E).   Under the dereliction of duty statute, public servants are prohibited from recklessly doing any act expressly forbidden by law with respect to the public servant's office or, alternatively, from recklessly failing to perform a duty expressly imposed by law with respect to that office.   R.C. 2921.44(E).

**{¶ 27}** "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.   A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such

circumstances are likely to exist."   R.C. 2901.22(C).

{¶ 28} In general, governing bodies of political subdivisions, such as the Board of Education of Bellbrook-Sugarcreek Local School District, may use public funds to "publish and distribute newsletters, or to use any other means, to communicate information about the plans, policies, and operations of the political subdivision to members of the public within the political subdivision and to other persons who may be affected by the political subdivision."   R.C. 9.03(B).   There are, however, several exceptions to the general rule. Of relevance here, such governing bodies may not use public funds to "[p]ublish, distribute, or otherwise communicate information that * * * [s]upports or opposes * * * the passage of a levy or bond issue."   R.C. 9.03(C)(1)(e).

{¶ 29} Slouffman argues that the evidence did not establish dereliction of duty. First, she argues that State's Exhibit 20 did not constitute advocacy for the passage of the levy.   She focuses on the phrase "Continue the Excellence" on the Board postcard and asserts that this "tagline" was merely a statement of fact.   Slouffman further asserts that she did not act recklessly.   She argues that she "did not engage in any 'conduct' whatsoever" and emphasizes that the postcard was created and mailed without her approval.

{¶ 30} Upon review of State's Exhibit 20, the trial court reasonably concluded that the Board postcard, which was paid for by Bellbrook-Sugarcreek Board of Education, supported the passage of a levy, Issue #4.   While much of the letter on the back of the Board postcard could be characterized as information about "the plans, policies, and operations" of the school district, both the front and back of the Board postcard contained

the phrase, "Continue the Excellence with the passage of Issue 4!" This phrase unambiguously urged recipients of the mailing to maintain the high quality of the district's schools ("continue the excellence") by voting in favor of the levy ("with the passage of Issue 4"). Slouffman's argument that the Board postcard was purely factual, not advocacy, is belied by the postcard itself. The trial court's conclusion that the Board postcard supported the passage of the levy was neither based on insufficient evidence nor against the manifest weight of the evidence.

{¶ 31} Slouffman's argument that she did not act recklessly relies substantially on her assertion that she was not engaged in the creation of the Board postcard and did not see it in any form until she received it through the mail. Upon review of the stipulated exhibits and the testimony at trial, the trial court reasonably found that Slouffman's conduct rose to the level of recklessness.

{¶ 32} On April 19, 2019, Kingston texted the other Board members, writing that Cozad and Betz thought that the Board should write a letter to the community about "the levy and why we decided to put it on the ballot." State's Ex. 15. Kingston indicated that she would be working on a first draft and asked the other Board members for "some bullet points of your thoughts." *Id.* In Cozad's weekly update for April 19, 2019, which was emailed to the Board on April 20, Cozad similarly wrote: "Kathy is working on a letter from the Board that will go out to the community. Please send her your thoughts." State's Ex. 16.

{¶ 33} On April 22, Carpenter provided a lengthy email reply to Kingston, which the other Board members received. State's Ex. 17. He included a copy of a response

that he had given to a constituent on Facebook, as well as a bullet-point list with several reasons for putting the levy on the ballot or avoiding a loss of funding. His list included rationales purportedly from the student, parent, and citizen perspectives. Carpenter acknowledged at trial that his Facebook response to the citizen was "somewhat of a blending" of advocacy and statements of fact.

{¶ 34} Slouffman did not respond to Kingston's request for ideas. She explained at trial that "[t]here was no need to respond. He [Carpenter] did a good job." Trial Tr. 171-172. Slouffman also believed that the other Board members, Carpenter excepted, did not care about her input. *Id.* at 172. In email responses sent later that day, other Board members were complimentary of Carpenter's comments. Kingston also asked in an email what the postcard's dimensions would be. State's Ex. 17. Cozad responded, "6 x 9… so it can't be a [sic] too lengthy." *Id.* Slouffman received each of these communications. *See id.*

{¶ 35} Slouffman understood that the Board would be mailing a postcard to the community regarding the reasons the levy was put on the ballot. Considering the vocal opposition that the levy was receiving, the trial court reasonably concluded that the purpose behind the mailing was to support the passage of the levy. Carpenter provided suggestions for the postcard's content which, while perhaps factual, went beyond simply information "about the plans, policies, and operations" of the school district. *See also* R.C. 3315.07(B) (describing bulletins and other materials that may be provided by a board of education with school funds). Slouffman did not express any concern about Carpenter's suggestions for what the postcards should contain, and she testified at trial

that she approved of Carpenter's suggestions and the written content of the postcards. Trial Tr. at 189. Her unhappiness with the Board postcard mainly concerned the photograph that was included and the use of her name without her approval; she expressed those complaints to Kingston after receiving the mailing. *See* Trial Tr. at 187-188. While Slouffman did not see the invoice for the postcards in May 2019, *id.* at 114, she never told anyone that public funds should not be used to pay for them. *Id.* at 186.

{¶ 36} Slouffman emphasizes that she expected to see the Board postcard before it was sent but did not. At trial, she described the workings of the Board, stating that Betz, Kingston, and Frantz "continued to do business the way they always had and we [she and Carpenter] were an annoyance to them." Trial Tr. at 172. She continued: "It didn't seem right, a lot of the things they were doing. They weren't consulting us * * *. They were just making decisions all by themselves, kind of like that's how it's going to be." *Id.* Slouffman believed the others did not care about her thoughts, which contributed to her lack of responsiveness to the texts and emails. Trial Tr. at 172-173. Slouffman said that she did not ask to see a draft of the mailing before it was sent because "[t]hat's the way things should go." Trial Tr. at 185. Even with the culture that Slouffman described, we cannot conclude that the trial court lost its way in concluding that Slouffman acted recklessly with respect to the content of the postcards and the use of district funds to pay for them.

{¶ 37} Slouffman's assignments of error are overruled.

## IV. Conclusion

{¶ 38} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and EPLEY, J., concur.